354 F.3d 124
UNITED STATES of America, Appellee-Cross-Appellant,v.Thomas RYBICKI, Fredric Grae, Grae, Rybicki & Partners, P.C., Defendants-Appellants-Cross-Appellees.
No. 00-1043.
No. 00-1044.
No. 00-1052.
No. 00-1055.
United States Court of Appeals, Second Circuit.
Rehearing in banc: October 16, 2002.
Decided: December 29, 2003.

COPYRIGHT MATERIAL OMITTED Barbara D. Underwood, Chief Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York; David C. James, Assistant United States Attorney, Daniel R. Alonso, Assistant United States Attorney, of counsel), Brooklyn, NY, for Appellee-Cross-Appellant.
Herald Price Fahringer, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP (Erica T. Dubno, of counsel), New York, NY, for Defendants-Appellants-Cross-Appellees Thomas Rybicki, Fredric Grae, and Grae, Rybicki & Partners, P.C.
Barry E. Schulman, Brooklyn, NY, submitted a brief for Defendant-Appellant-Cross-Appellee Thomas Rybicki.
Ephraim Savitt, New York, NY, submitted a brief for Defendant-Appellant-Cross-Appellee Fredric Grae.
Richard A. Greenberg, Newman & Greenberg, New York, N.Y. (Karl E. Pflanz; Victor J. Rocco, New York Council of Defense Lawyers, New York, NY, of counsel) for Amicus Curiae New York Council of Defense Lawyers.
Ellen S. Podgor, Georgia State University College of Law, Atlanta, GA (Joshua L. Dratel, New York, NY, of counsel) for Amici Curiae National Association of Criminal Defense Lawyers and New York Association of Criminal Defense Lawyers.
Before: WALKER, Chief Judge, JACOBS, CALABRESI, CABRANES, F.I. PARKER,* STRAUB, POOLER, SACK, SOTOMAYOR, KATZMANN, B.D. PARKER, and RAGGI, Circuit Judges.
SACK, J., filed an opinion in which CALABRESI, STRAUB, POOLER, and SOTOMAYOR, JJ., joined, and in which KATZMANN, J., joined except for parts II.A and V.E thereof, as to which he filed a separate opinion. RAGGI, J., filed an opinion concurring in the judgment.
JACOBS, J., filed a dissenting opinion in which JOHN M. WALKER, JR., C.J., and JOSÉ A. CABRANES and B.D. PARKER, JR., JJ., joined. JOHN M. WALKER, JR., C.J., and JOSÉ A. CABRANES, J., also filed an opinion concurring in the dissent.
SACK, Circuit Judge.

1
We agreed to rehear this case in banc in order to consider whether 18 U.S.C. § 1346, which provides that "[f]or the purposes of th[e] chapter [of the United States Code that prohibits, inter alia, mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343], the term `scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services," is unconstitutionally vague. Based upon a review of the case law extant at the time that Congress enacted section 1346, we conclude that the statute clearly prohibits a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer. Section 1346 is therefore not unconstitutionally vague as applied to the facts of this case, in which the defendants arranged for secret gratuities to be paid to claims adjusters employed by insurance companies against whom the defendants' clients asserted claims. Our analysis reveals that the statute's clear prohibition applies to a wide swath of behavior. We conclude that the statute is not unconstitutional on its face. Finally, we agree with the three-judge panel that first heard this appeal, see United States v. Rybicki, 287 F.3d 257, 266-67 (2d Cir.2002) ("Rybicki"), that during the course of the trial of this case in the United States District Court for the Eastern District of New York (Carol Bagley Amon, Judge), the jury was properly instructed on all of the elements of the crimes for which the defendants were convicted, and that a reasonable jury could have found on the evidence admitted at trial that the defendants had committed all the elements of those crimes. We therefore affirm the judgments of conviction and sentence of the district court.

BACKGROUND

2
The facts underlying this appeal are set forth in the opinion of the three-judge panel. Rybicki, 287 F.3d at 259-61. We rehearse them here only insofar as we think it necessary to explain our resolution of this appeal.

3
Thomas Rybicki and Fredric Grae, two of the three Defendants-Appellants, are lawyers with offices in New York City's Borough of Richmond. Specializing in personal injury cases, they are members of the third Defendant-Appellant, the law firm of Grae, Rybicki & Partners, P.C. The defendants, acting through intermediaries, arranged for payments to be made to claims adjusters employed by insurance companies that had insured against injuries sustained by the defendants' clients. The payments, designed to induce the adjusters to expedite the settlement of the clients' claims, were typically computed as a percentage of the total settlement amount. Each of the insurance companies maintained a written policy that prohibited the adjusters from accepting any gifts or fees and required them to report the offer of any such gratuities. The payments were nonetheless accepted by the adjusters and, not surprisingly, not reported to their employers. Between 1991 and 1994, the defendants caused such payments to be made to adjusters in at least twenty cases that settled for an aggregate of $3 million. The participants in the scheme, including Grae and Rybicki, took considerable steps to disguise and conceal the payments.

4
On June 3, 1998, the defendants were indicted for these actions. The superseding indictment charged the defendants with scheming to deprive the insurance companies of their intangible right of the honest services of their employees — the insurance adjusters — by the use of the mails and the wires, in violation of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy). As explained in further detail below, the mail- and wire-fraud statutes criminalize the use of the mails and wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1341 (mail-fraud statute); 18 U.S.C. § 1343 (wire-fraud statute). 18 U.S.C. § 1346 defines "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services."

5
At the outset of the defendants' eight-week trial, the government acknowledged that it would not seek to prove that the amount of any of the settlements connected with a payment to an adjuster had been inflated above what would have been a reasonable range for that settlement.1

6
The jury returned a verdict of guilty against each defendant on twenty counts of mail fraud, two counts of wire fraud, and one count of conspiracy to commit mail fraud. The defendants Grae and Rybicki were each sentenced by the district court to a term of imprisonment of one year and one day, three years of supervised release, a $20,000 fine, and a $1,150 special assessment. The district court stayed the defendants' surrender pending resolution of this appeal. The defendant Grae, Rybicki & Partners, P.C., was sentenced to three years' probation, an $80,000 fine, and a $4,600 special assessment.

7
On appeal, the defendants raised a host of legal and factual challenges to their convictions, most of which were disposed of by a summary order, United States v. Rybicki, Nos. 00-1043, 00-1055, 00-1044, 00-1052, 2002 WL 655214, 2002 U.S. App. LEXIS 7472, 38 Fed.Appx. 626 (2d Cir. Apr. 22, 2002), issued simultaneously with the published panel opinion. We confirm the resolution of those issues by the panel and do not revisit them here.

8
The published panel opinion, Rybicki, 287 F.3d at 263, addressed the defendants' argument that section 1346's expansion of the definition of "scheme or artifice to defraud" to include a scheme or artifice to deprive another of "the intangible right of honest services" is unconstitutionally vague. The panel rejected the argument that the statute was unconstitutionally vague as applied, while concluding that the Court could not consider its asserted facial unconstitutionality because the challenge was not based on the statute's impact on the exercise of First Amendment rights, and that that is the only basis upon which a facial challenge can be mounted under Circuit case law. Rybicki, 287 F.3d at 263-64. In evaluating the as-applied claim, the panel concluded that it was bound by this court's decisions in United States v. Sancho, 157 F.3d 918 (2d Cir. 1998) (per curiam), cert. denied, 525 U.S. 1162, 119 S.Ct. 1076, 143 L.Ed.2d 79 (1999), and United States v. Middlemiss, 217 F.3d 112 (2d Cir.2000), which upheld "convictions under § 1346 that involved schemes, like the one at issue here, in which the defendant breached or induced the breach of a duty owed by an employee or agent to his employer or principal that was enforceable by an action at tort." Rybicki, 287 F.3d at 264. The panel opinion concluded that the jury had been properly instructed on the elements of the crimes, and that the evidence supported such findings by the jury. Id. at 266-67. The panel therefore affirmed the defendants' convictions. Id. at 267.

9
The defendants petitioned for a rehearing in banc, which was granted. July 3, 2002, Order Granting Defendants' Petition for Rehearing in Banc, at 2.

DISCUSSION
I. "Plain Error" Analysis

10
Although defendant Rybicki objected to the vagueness of the language of the indictment when moving to dismiss, the defendants did not challenge the vagueness of the statute itself before the district court. We therefore review the court's failure to find the statute unconstitutional for "plain error." See Fed.R.Crim.P. 52(b).

11
The framework of the analysis for plain error pursuant to Rule 52(b) is the four-pronged test set forth in United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

12
United States v. Thomas, 274 F.3d 655, 667 (2d Cir.2001) (in banc) (citations, internal quotation marks, and alterations omitted).

13
One of the criteria for determining "plain error" is thus whether there was error. We ultimately conclude that the district court committed no error, plain or otherwise, by failing to hold, unbidden, that section 1346 is unconstitutional. We therefore affirm on that issue without addressing the other "plain error" criteria. Cf. United States v. Quintieri, 306 F.3d 1217, 1234 (2d Cir.2002) (deciding that absence of error compelled conclusion that there was no plain error), cert. denied, 531 U.S. 899, 121 S.Ct. 233, 148 L.Ed.2d 167 (2003).

II. The "Void-for-Vagueness" Doctrine

A. Facial Invalidity

14
Our task is thus to determine whether the district court erred by failing to find section 1346 unconstitutionally vague. "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only "as applied," i.e., "in light of the specific facts of the case at hand and not with regard to the statute's facial validity." United States v. Nadi, 996 F.2d 548, 550 (2d Cir.), cert. denied, 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993). "[O]ne whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." Id.; accord Rybicki, 287 F.3d at 263 ("Where there is a vagueness challenge to a statute that does not involve First Amendment freedoms, the statute must be evaluated on an `as applied' basis."); United States v. Whittaker, 999 F.2d 38, 42 (2d Cir.1993) ("Other than in the First Amendment context, vagueness challenges also must be examined in light of the facts of the case, on an as-applied basis.") (citation and internal quotation marks omitted); United States v. Jackson, 968 F.2d 158, 161 (2d Cir.) ("Vagueness challenges to statutes that do not involve First Amendment interests are examined in light of the facts of the case at hand."), cert. denied, 506 U.S. 1024, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992); United States v. Coonan, 938 F.2d 1553, 1562 (2d Cir.1991) ("In the absence of first amendment considerations, vagueness challenges must be evaluated based on the particular application of the statute and not on the ground that the statute may conceivably be applied unconstitutionally to others in situations not before the Court.") (citation, internal quotation marks, and brackets omitted), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); United States v. McElroy, 910 F.2d 1016, 1021 (2d Cir.1990) ("Vagueness challenges outside the context of the First Amendment are to be examined in light of the facts of the case, on an as-applied basis."). And in Chapman v. United States, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), relied upon by our Nadi panel for this proposition, 996 F.2d at 550, the Supreme Court did indeed conclude that "First Amendment freedoms are not infringed by [the statute at issue], so the vagueness claim must be evaluated as the statute is applied...." Chapman, 500 U.S. at 467, 111 S.Ct. 1919; accord Maynard v. Cartwright, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."). According to this line of cases, outside the First Amendment context, vagueness challenges will be considered only as applied.

15
The Supreme Court made essentially the same point in Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), extending the "as applied" principle to cases raising facial challenges:

16
[A]ssuming the enactment implicates no constitutionally protected conduct, [a court] should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

17
Id. at 494-95, 102 S.Ct. 1186. The Court reiterated this standard in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), noting in dicta that a statute can be held facially unconstitutional even if the challenge is not raised under the First Amendment, but the test for facial unconstitutionality then is whether any

18
set of circumstances exists under which the [statute in question] would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Court] has not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.

19
Id. at 745, 107 S.Ct. 2095.2 In other words, where First Amendment overbreadth analysis is not available, a statute will be held unconstitutionally vague "on its face" only if it is unconstitutionally vague "as applied" to all circumstances.

20
Even among those cases in which consideration of facial vagueness challenges outside the First Amendment context is said to be possible, there is disagreement as to the nature of such review. The Flipside/Salerno approach was questioned by three members of the Court in City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (opinion of Stevens, J.). There, even though First Amendment rights were not implicated, the Court struck down an anti-loitering statute as facially unconstitutional without first considering whether the statute was unconstitutionally vague as applied to the facts of the case or whether any set of circumstances existed in which the statute would be valid. The Morales plurality addressed the question whether and to what extent a facial challenge would be considered outside the First Amendment context thus:

21
[I]t is clear that the vagueness of this enactment makes a facial challenge appropriate. This is not an ordinance that "simply regulates business behavior and contains a scienter requirement." See Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 [102 S.Ct. 1186, 71 L.Ed.2d 362] (1982). It is a criminal law that contains no mens rea requirement, see Colautti v. Franklin, 439 U.S. 379, 395 [99 S.Ct. 675, 58 L.Ed.2d 596] (1979), and infringes on constitutionally protected rights, see id., at 391 [99 S.Ct. 675]. When vagueness permeates the text of such a law, it is subject to facial attack.

22
Id. at 55, 119 S.Ct. 1849. And in dicta of its own, the Morales plurality explicitly rejected the Salerno test. Id. at 54 n. 22, 119 S.Ct. 1849 ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself...."); see also id. at 69, 119 S.Ct. 1849 (Kennedy, J., concurring) (concluding the statute was unconstitutional because it "would reach a broad range of innocent conduct"). At the same time, however, three Justices specifically endorsed the Salerno standard. Id. at 78-83, 119 S.Ct. 1849 (Scalia, J., dissenting); id. at 111, 119 S.Ct. 1849 (Thomas, J., joined by Rehnquist, C.J. and Scalia, C.J., dissenting).

23
The approach of the Morales plurality has not been adopted by the Supreme Court as a whole. Although panels of this Court have noted that Morales may have rejected the Salerno dicta, we have not concluded that a majority of the Supreme Court has done so. See Lerman v. Bd. of Elections of New York, 232 F.3d 135, 144 n. 10 (2d Cir.2000) ("It is not even clear that Salerno's `no set of circumstances' test articulates an exclusive standard for making facial challenges outside the First Amendment context, as a plurality of the Supreme Court recently has noted." (citing Morales, 527 U.S. at 55 n. 22, 119 S.Ct. 1849) (emphasis in original)), cert. denied, 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001). We therefore are not required to apply it here. We note, nonetheless: first, that under the Morales plurality's approach, to invalidate as unconstitutionally vague on its face a statute that does not implicate First Amendment rights and might be valid under some set of circumstances, a court would have to conclude that the law is "permeated" with vagueness, and, perhaps, that it infringes on a constitutional right and has no mens rea requirement, see Morales, 527 U.S. at 55, 119 S.Ct. 1849 (opinion of Stevens, J.); and second, that under the analysis that follows, the statute before us is sufficiently clear to survive a facial challenge under either Morales or Salerno.3

24

B. Invalidity "As Applied"

25
Irrespective of whether and to what extent we may consider a facial challenge, we can determine whether 18 U.S.C. § 1346 is constitutional as applied to the defendants under the circumstances at issue. We conclude, for the reasons set forth below, that 18 U.S.C. § 1346 together with either section 1341 or section 1343, "gives the person of ordinary intelligence a reasonable opportunity to know," Hoffman Estates, 455 U.S. at 498, 102 S.Ct. 1186, that conduct of the type in which the defendants engaged with the specific intent to defraud — use of the mails and wires to effect a scheme in which insurance adjusters were paid to induce them to expedite the settlement of the defendants' clients' insurance claims against the adjusters' employers without disclosure of the payments to the employers — deprived the insurance companies of the "honest services" of their employees and is therefore prohibited by law. Plainly, Messrs. Grae and Rybicki, as they used the wires and mails surreptitiously to, in effect, bribe employees of insurance companies to act in the interests of firm clients instead of the insurance companies, "had a reasonable opportunity to know" that they were violating sections 1341, 1343, and 1346. For the same reasons, we conclude that 18 U.S.C. § 1346, together with section 1341 or section 1343, provides explicit standards for those who seek to apply the statute, including federal prosecutors and courts, at least in the context of private-sector bribery cases such as this one. The statute, as applied, is therefore not unconstitutionally vague.

III. Section 1346 and Its History

26

A. "Honest Services" Mail and Wire Fraud until 1987

27
At the time the defendants committed the acts for which they were convicted, the federal mail-fraud statute, 18 U.S.C. § 1341, provided:

Frauds and swindles

28
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ..., for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

29
Id. (as in effect until September 13, 1994).4 The federal wire-fraud statute, 18 U.S.C. § 1343, criminalized virtually the same behavior when it involved the use of the wires, radio, or television:

Fraud by wire, radio, or television

30
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

31
Id. (as in effect until September 13, 1994).

32
Until 1987, federal courts read both statutes to criminalize not only schemes for obtaining money or property, but also "schemes to deprive another of `the intangible right of honest services.'" United States v. Handakas, 286 F.3d 92, 101 (2d Cir.), cert. denied, 537 U.S. 894, 123 S.Ct. 168, 154 L.Ed.2d 160 (2002).

33
Over time, the "honest services" doctrine became applicable to four general categories of defendants: [1] government officials who defraud the public of their own honest services; [2] elected officials and campaign workers who falsify votes and thereby defraud the electorate of the right to an honest election; [3] private actors who abuse fiduciary duties by, for example, taking bribes; and [4] private actors who defraud others of certain intangible rights, such as privacy.

34
Id. at 101-02 (citing McNally v. United States, 483 U.S. 350, 362-64 nn. 1-4, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (Stevens, J., dissenting)) (brackets in original);5 see also John C. Coffee, Jr., From Tort to Crime: Some Reflections on the Criminalization of Fiduciary Breaches and the Problematic Line Between Law and Ethics, 19 Am.Crim. L.Rev. 117, 127-30 (1981) (describing non-money-or-property cases decided before 1981 as dealing with public corruption and the alleged breaches of a fiduciary duty to provide honest services "involv[ing] private officials, typically corporate officers and employees"); Geraldine Szott Moohr, Mail Fraud Meets Criminal Theory, 67 U. Cin. L.Rev. 1, 3-15 (1998) (describing the mail-fraud statute as having evolved into three variations targeting different harms: "pecuniary mail fraud, honest services mail fraud, and intangible property mail fraud").

B. McNally v. United States

35
Then the Supreme Court decided McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In McNally, a public corruption case, the Supreme Court surveyed the history of the mail-fraud and wire-fraud statutes. It concluded with little effort that "[t]he mail fraud statute [18 U.S.C. § 1341] clearly protects property rights," id. at 356, 107 S.Ct. 2875, but does not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly," id. at 358, 107 S.Ct. 2875. Under McNally, all schemes or artifices to defraud relating to intangible rights to good government, honest services, privacy — indeed all things other than money or property — were therefore beyond the mail-fraud proscriptions. By necessary implication, the wire-fraud proscriptions were similarly limited. See Rybicki, 287 F.3d at 261 (citing United States v. Covino, 837 F.2d 65, 71 (2d Cir. 1988)).

36
McNally appears to have been decided largely on the basis of separation of powers considerations: Courts are not free to expand criminal liability for fraud beyond the clear statement of Congress. McNally, 483 U.S. at 360, 107 S.Ct. 2875 ("`There are no constructive offences; and before one can be punished, it must be shown that his case is plainly within the statute.'" (quoting Fasulo v. United States, 272 U.S. 620, 629, 47 S.Ct. 200, 71 L.Ed. 443 (1926))). Establishing federal criminal liability is the sole province of Congress. Id. at 359-60, 107 S.Ct. 2875.

37
Although McNally therefore concluded that Congress had to "speak more clearly" if it would retain the honest services crime, McNally, 483 U.S. at 360, 107 S.Ct. 2875, the Court did not — as we do today — consider whether the judicially developed honest services doctrine was vague, let alone unconstitutionally so. The requirement to "speak more clearly" did not mean that Congress had to provide a more specific definition of "honest services" than that which the courts were then using. It meant only that Congress was required clearly to express its intention to criminalize that behavior if it wished to do so.

C. Enactment of Section 1346

38
In November of the year following McNally, Congress therefore enacted Pub.L. No. 100-690, Title VII, § 7603(a), 102 Stat. 4508 (1988), codified at 18 U.S.C. § 1346, which states simply:

39
Definition of "scheme or artifice to defraud"

40
For the purposes of this chapter [18 U.S.C. § 1341 et seq.], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

41
Id. As the Rybicki panel observed, "Congress enacted § 1346 in response to McNally and reinstated the `intangible rights' doctrine." Rybicki, 287 F.3d at 261.

IV. Determining the Meaning of Section 1346

42
"Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." City of Chicago v. Morales, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) (citing Kolender v. Lawson, 461 U.S. at 357, 103 S.Ct. 1855); accord id. at 64-65, 119 S.Ct. 1849 (O'Connor, J., concurring).6 "`It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits....'" Id. at 56, 119 S.Ct. 1849 (quoting Giaccio v. Pennsylvania, 382 U.S. 399, 402-403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)). "`No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.'" Id. at 58, 119 S.Ct. 1849 (quoting Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939)).

In the view of the Rybicki panel:

43
[B]ecause the statute does not define honest services, the potential reach of § 1346 is virtually limitless. See [United States v.] Frost, 125 F.3d [346,] 368-69 [(6th Cir.1997)] (discussing potential breadth of statute and "need to avoid the over-criminalization of private relationships"). As [the Court] ha[s] noted, "not every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud." United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir. 1986), aff'd, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); see also United States v. Sun-Diamond Growers, 138 F.3d 961, 973 (D.C.Cir.1998) (making same observation with respect to violations of § 1346).

Rybicki, 287 F.3d at 264.7

44
We would, we think, labor long and with difficulty in seeking a clear and properly limited meaning of "scheme or artifice to deprive another of the intangible right of honest services" simply by consulting a dictionary for the literal, "plain" meaning of the phrase. But even if such a "clinical lexical dissection," Immediato v. Rye Neck School Dist., 73 F.3d 454, 460 (2d Cir.), cert. denied, 519 U.S. 813, 117 S.Ct. 60, 136 L.Ed.2d 22 (1996), would not yield a precise meaning to the statutes, that is not the end of our inquiry.

45
It is a well-established rule of construction that "`[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 [112 S.Ct. 1344, 117 L.Ed.2d 581] (1992) (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739 [109 S.Ct. 2166, 104 L.Ed.2d 811] (1989)); see Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 59 [31 S.Ct. 502, 55 L.Ed. 619] (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense").

46
Neder v. United States, 527 U.S. 1, 21-22, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (ellipsis in original).8 Our task, then, is to determine whether, even if the meaning of the statute is not plain enough on its face, there was a "well-settled meaning" of "scheme or artifice to deprive another of the intangible right of honest services" at the time that Congress enacted section 1346 in 1988.

47
The sparse legislative history of section 1346 makes clear, if little else, that the statutory provision was designed to "overrule" McNally at least in part, i.e., to place within the statutory proscription certain frauds that McNally had held were not covered by the mail- and wire-fraud statutes. See, e.g., United States v. Brumley, 116 F.3d 728, 742-45 (5th Cir.) (en banc) (Jolly & DeMoss, JJ., dissenting), cert. denied, 522 U.S. 1028, 118 S.Ct. 625, 139 L.Ed.2d 606 (1997); see also United States v. Frost, 125 F.3d 346, 364 (6th Cir.1997) (collecting authority for the proposition that the "[t]iming and the explicit terms of § 1346 make clear that Congress intended the provision to reinstate the doctrine of intangible rights to honest services"), cert. denied, 525 U.S. 810, 119 S.Ct. 40, 41, 142 L.Ed.2d 32 (1998). Particularly in light of the strong presumption that section 1346, having been duly enacted by Congress and signed into law by the President, is valid, Parker v. Levy, 417 U.S. 733, 757, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (citing United States v. National Dairy Corp., 372 U.S. 29, 32-33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963)),9 we must therefore look to the case law from the various circuits that McNally overruled in order to determine whether there was a clear meaning of "scheme or artifice to deprive another of the intangible right of honest services" at the time that Congress enacted section 1346, and then determine whether that meaning is sufficiently clear.10

48
As acknowledged in Neder, 527 U.S. at 21-22, 119 S.Ct. 1827, this approach is not dissimilar from the Supreme Court's examination of the common law at the time of passage of the Sherman Act, many generations ago, to determine the meaning of, inter alia, the phrase "[e]very contract, combination ... or conspiracy, in restraint of trade." See Standard Oil Co. v. United States, 221 U.S. 1, 59, 31 S.Ct. 502, 55 L.Ed. 619 (1911) ("Let us consider the language of [the Act], guided by the principle that where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary." (footnote omitted)).11

49
We note, finally, that the particular wording of section 1346 leads us to regard this approach as likely to be fruitful. The statute refers to "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346 (emphasis added). The definite article "the" suggests that "intangible right of honest services" had a specific meaning to Congress when it enacted the statute — Congress was recriminalizing mail- and wire-fraud schemes to deprive others of that "intangible right of honest services," which had been protected before McNally, not all intangible rights of honest services whatever they might be thought to be. There is no reason to think that Congress sought to grant carte blanche to federal prosecutors, judges and juries to define "honest services" from case to case for themselves.12

50
V. The Meaning of Section 1346 in Light of Pre-McNally Case Law

A. The Pre-McNally Cases — Generally

51
To determine what Congress intended when it recriminalized "honest services" fraud, we have reviewed the principal pre-McNally decisions involving or purportedly involving "honest services" fraud in the private sector.13 The meaning of the phrase "scheme or artifice to defraud" with respect to public corruption cases is not at issue in the matter before us, and, although we have been given no reason to doubt that it is susceptible to a similar mode of analysis, we do not consider it.

52
The private-sector honest services cases fall into two general groups, cases involving bribes or kickbacks, and cases involving self-dealing.

B. The Bribery or Kickback Cases

53
In the bribery or kickback cases, a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment. In United States v. George, 477 F.2d 508 (7th Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 155, 158, 49, 38 L.Ed.2d 61 (1973), an employee and two of his employer's suppliers were convicted of mail fraud for taking part in a scheme in which the suppliers secretly paid kickbacks to the employee in exchange for the employer's business. In United States v. Bryza, 522 F.2d 414 (7th Cir.1975), cert. denied, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976), a purchasing agent secretly accepted kickbacks from the suppliers from whom he bought products for his employer. The Seventh Circuit explained that "[t]he fraud consisted in [the defendant's] holding himself out to be a loyal employee, acting in [the employer's] best interests, but actually not giving his honest and faithful services, to [the employer's] real detriment." Id. at 422. In United States v. Hasenstab, 575 F.2d 1035 (2d Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978), a buyer for an airline was convicted of mail and wire fraud for receiving kickbacks from a supplier of business forms and computer paper in return for the buyer routing orders to the supplier, and giving the supplier advance information regarding its competitors' bids on contracts offered by the employer. Id. at 1036-38. In United States v. Bohonus, 628 F.2d 1167 (9th Cir.), cert. denied, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980), an officer and director of a corporation's subsidiaries was convicted of mail fraud for extorting insurance brokers doing business with the corporation by threatening to cancel contracts between the corporation and the insurance brokers unless the brokers agreed secretly to kick back a portion of their commissions to him. And in United States v. Conner, 752 F.2d 566 (11th Cir.), cert. denied, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985), employees of two corporations and their co-conspirators secretly engaged in a variety of schemes in which they took secret kickbacks from real estate brokers doing business with their employers or secretly acquired interests in land their employers sought to acquire, and were therefore convicted of mail and wire fraud. Id. at 569-72.

54
Cases involving union officials tend to fit the pattern of the private-sector bribery cases.14 In United States v. Schwartz, 785 F.2d 673 (9th Cir.), cert. denied, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986), a double jeopardy case, union officials were accused of giving union insurance contracts to third parties as payment on a secret arrangement in which the third parties lobbied the union national for actions that would allow the officials to keep their positions and avoid an impending union election. Id. at 675-76. Although the officials were indicted for wire fraud, none were convicted. Id. at 678. In United States v. Boffa, 688 F.2d 919 (3d Cir.1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983) & 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 501 (1983), a union official was convicted of mail fraud for taking bribes from an employer in exchange for helping the employer de-unionize. Id. at 923-24. And in United States v. Price, 788 F.2d 234 (4th Cir.1986), vacated sub nom. McMahan v. United States, 483 U.S. 1015, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987), union officials were convicted of mail fraud and conspiracy to commit mail fraud for obtaining union memberships for persons who were not qualified for them in exchange for payments beyond ordinary union fees, which were diverted to the officials. Id. at 235.

C. The Self-Dealing Cases

55
In the self-dealing cases, the defendant typically causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer. In Epstein v. United States, 174 F.2d 754 (6th Cir.1949), the defendants, who were officers and directors of two brewing companies, caused the companies to enter into contracts to purchase supplies from companies in which the defendants allegedly had secret ownership interests.15 In United States v. McCracken, 581 F.2d 719 (8th Cir.1978), the defendant was convicted of mail fraud for using a corporation, in which he had an interest unknown to his employer, to buy and sell fertilizer to and from the employer to the employee's advantage and his employer's disadvantage. In United States v. Von Barta, 635 F.2d 999 (2d Cir.1980), cert. denied, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981), the defendant, an employee of a brokerage firm, was indicted for committing mail and wire fraud by causing his employer to extend credit to an undercapitalized investment fund in which the defendant secretly owned a half interest. The defendant did not disclose to his employer that he partly owned and controlled the fund, or that the fund was insufficiently capitalized under the employer's criteria for extending credit. Id. at 1002-03.

56
In United States v. Ballard, 663 F.2d 534 (5th Cir. Unit B 1981), modified in part and reh'g denied, 680 F.2d 352 (5th Cir. Unit B 1982), the Fifth Circuit held, with respect to a scheme among employees to make secret profits trading fuel oil, that mail fraud could be established only if there was some detriment to the employer. Where the profit made by the employer was, in any event, the maximum fixed by law, there could be no such detriment and there was therefore no "honest services" fraud. See id. at 354 n. 5. In United States v. Lemire, 720 F.2d 1327 (D.C.Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984), the defendant was convicted of wire fraud for helping a bidder, on a contract to supply housing overseas, win a contract bid with his employer in order secretly to supply the shipping himself. And in United States v. Kwiat, 817 F.2d 440 (7th Cir.), cert. denied, 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987), the co-conspirator defendants, who were officers and directors of a bank, had been convicted of mail fraud for causing the bank to make unsound loans to persons buying condominiums through a real-estate company some of the defendants controlled, for the purpose of generating secret commissions for the co-conspirators. Id. at 472. The Seventh Circuit reversed the defendants' conviction because of an insufficient relationship between the fraudulent scheme and the use of the mails. Id. at 444.

57
The self-dealing cases are thus of the same general import as the bribery cases, with this apparent difference: In bribery or kickback cases, the undisclosed bribery itself is sufficient to make out the crime, but in self-dealing cases, the existence of a conflict of interest alone is not sufficient to do so. See Lemire, 720 F.2d at 1336 ("An employee's undisclosed conflict of interest does not by itself necessarily pose the threat of economic harm to the employer."); Ballard, 663 F.2d at 540 ("[A] breach of fiduciary duty can constitute an illegal fraud under § 1341 only when there is some detriment to the employer."); Epstein, 174 F.2d at 765 ("[T]he receipt of such returns by a director without disclosure of interest to the board of directors does not constitute the perpetration of an active, intentional fraud upon his corporation where there is good faith, fair dealing, and benefit to the corporation of which he is a director."). In the self-dealing context, though not in the bribery context, the defendant's behavior must thus cause, or at least be capable of causing, some detriment — perhaps some economic or pecuniary detriment — to the employer.16

58

D. The Meaning of Section 1346 in Private-Sector Cases

59
In sum, we conclude from the cases in the various circuits that had employed an "honest services" theory prior to Congress's enactment of section 1346 that the term "scheme or artifice to deprive another of the intangible right to honest services" in section 1346, when applied to private actors, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers17) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person. As noted, in self-dealing cases, unlike bribery or kickback cases, there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment — but that is of no moment with respect to the case at bar, which involves secret payments, not conflicts of interest.

60
In the case before us, the defendants used the mails and wires to induce insurance adjusters, who were purporting to act for and in the interests of their employer insurance companies, secretly to expedite insurance claims in order to advance their own interest in receiving payments from the defendants. These actions were not disclosed to the employer insurance companies, and hence were accompanied by a material omission. They fall squarely within the meaning of "scheme or artifice to deprive another of the intangible right of honest services" as distilled from the pre-McNally private sector cases. At the end of the day, we simply cannot believe that Messrs. Rybicki and Grae did not know that they were courting prosecution and conviction for mail and wire fraud when they undertook to use the wires and the mails, in effect, to pay off insurance adjustors, while assiduously covering their tracks.

61
Because we find that the phrase "scheme or artifice to deprive another of the intangible right of honest services" has the meaning it had in the pre-McNally case law, we think that the potential reach of section 1346 is not "virtually limitless," Rybicki, 287 F.3d at 264. We conclude that the statute, as applied to the defendants' intentionally fraudulent behavior, "define[s] the criminal offense with sufficient definiteness that ordinary people [such as the defendants] can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender, 461 U.S. at 357, 103 S.Ct. 1855. It will also "channel the discretion of the prosecution," Handakas, 286 F.3d at 101; "it will provide[] explicit standards for those who apply it," id. (citation and internal quotation marks omitted). The statute as applied to the facts of this case is therefore not unconstitutionally vague.

62
The dissent makes much of the differing views among the various circuit courts of appeals in interpreting section 1346, suggesting the hopeless vagueness of the statute. In doing so, it studiously ignores one striking unanimous aspect of the case law: No circuit has ever held, as the dissent would, that section 1346 is unconstitutionally vague.

63
More important, divergence in panel or circuit views of a statute, criminal or otherwise, is inherent — and common — in our multi-circuit system. Disparity does not establish vagueness. For one of any number of examples, see Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (holding that 18 U.S.C. § 924(c)(1), which, in relevant part, imposes a prison term upon a person who "during and in relation to any ... drug trafficking crime ... uses or carries a firearm," requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the drug trafficking offense). There, the Supreme Court clarified the meaning of section 924(c)(1) after observing that: "As the debate within the District of Columbia Circuit illustrates, § 924(c)(1) has been the source of much perplexity in the courts. The Circuits are in conflict both in the standards they have articulated and in the results they have reached." Id. at 142, 116 S.Ct. 501 (citations omitted). The Court did not suggest, let alone conclude, based upon the diversity of views within the D.C. Circuit or among the circuits — the "perplexity" — that section 924(c)(1) was unconstitutionally vague.

64
The dissent may thus be making a valid argument that the Supreme Court, a large part of whose work consists of resolving just such "perplexity," should in an appropriate case seek to resolve inconsistencies in circuit analysis of section 1346. But it proves too much to argue from such circuit divisions that a statute is unconstitutionally vague. If so, there are a frightful number of fatally vague statutes lurking about.

65
The dissent also argues that the prosecution of persons whose behavior is not within our view of the prohibition of section 1346 — in Handakas, discussed infra, for example — shows the vagueness of the statute. We doubt that such occasional prosecution in error is much evidence that a statute is too vague. (Mr. Bailey was prosecuted in error, too, for using or carrying a firearm during a drug trafficking crime, but that did not establish that the statute under which he was prosecuted was unconstitutional. See Bailey, supra; see also Hubbard v. United States, 514 U.S. 695, 697-98, 715, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995) (reversing a defendant's criminal conviction under 18 U.S.C. § 1001 for making false statements "in any matter within the jurisdiction of any department or agency of the United States" after concluding that the conduct for which the defendant was prosecuted, making false statements in a federal judicial proceeding, did not fall within the scope of the statute, but not thereby concluding that the statute was fatally vague).) Prosecutors sometimes make mistakes as to the reach of criminal statutes; courts correct them. The very project of considering this section 1346 case in banc, moreover, was undertaken in the hope and expectation that a decision in this case, outlining our understanding of the statute in some detail and explaining why, under the statute, the prosecution in Handakas was misdirected, would go some way to make any such future prosecutorial misjudgment less likely.

E. The Facial Validity of Section 1346

66
While it is unclear, for reasons discussed in Part II of this opinion, whether it is appropriate to decide the question of the asserted facial invalidity of section 1346, we think that a conclusion of facial invalidity would be inconsistent with the foregoing analysis. Our analysis reveals that the statute's clear prohibition applies to a wide swath of behavior. We conclude that the statute is not unconstitutional on its face under either Salerno or Morales.

67

F. The Effect of Our Analysis on Previous Decisions

68
1. The Holding of United States v. Handakas. In Handakas, a panel of this court held that section 1346 was unconstitutionally vague as applied to a bid contractor working for a state school authority who willfully breached a contractual requirement that he pay the prevailing wage to his employees, and misrepresented the wages on disclosure forms that he was required by law to file with the state. Handakas, 286 F.3d at 96-97. Under the analysis set forth above, it is clear that the defendant's conduct in that case was not within the scope of behavior proscribed by section 1346: Handakas was not an employee of a private entity purporting to act for and in the interests of his or her employer; neither was he rendering services in which the relationship between him and the person to whom the service was rendered gave rise to a duty of loyalty comparable to that owed by employees to employers. His actions therefore did not come within the reach of section 1346.

69
There was thus no reason to reach the constitutional question in Handakas. In light of our duty to avoid passing on constitutional questions whenever possible, see id. at 113-14 (Feinberg, J., dissenting in part), we overrule the unnecessary constitutional ruling in that case without reviewing it on its merits.

70
Because we conclude that Handakas's conduct was not within the scope of section 1346, we have no occasion to conclude, as the Handakas panel did, that "the intangible right to honest services" covered by section 1346 can never arise in that context. See Handakas, 286 F.3d at 106-07. We note only that because of the nature of the services to be rendered in Handakas, an intangible right to honest services did not arise out of the contract at issue in that case.18

71
2. The Dictum in Sancho and Handakas. In United States v. Sancho, 157 F.3d 918 (2d Cir.1998), cert. denied, 525 U.S. 1162, 119 S.Ct. 1076, 143 L.Ed.2d 79 (1999), we suggested that pre-McNally case law is not "pertinent" when we apply section 1346. Id. at 921 ("Whether, prior to the passage of § 1346, the elements of § 1342 as applied to deprivations of intangible rights required a scheme to breach a fiduciary duty is ... no longer pertinent."); see also Handakas, 286 F.3d at 103 (citing Sancho as authority for the proposition that "[t]his Circuit has foreclosed the use of pre-McNally cases as a tool for construing the revised statute."). Our analysis here is based on pre-McNally case law. We therefore reject that dictum in Sancho and Handakas.19

72
We note, however, that we look to cases decided before the enactment of section 1346 only in order to determine what section 1346 meant to Congress when it enacted the statute. We do not think that that earlier case law is, after the intervening occurrences of McNally and section 1346, "precedent" in the sense that it sets forth rules of law that we are bound to follow. We might look to nineteenth-century common law to determine what a "combination in restraint of trade" is, but that common law itself does not thereby become binding upon us. The pre-McNally case law is "pertinent," even though we are not bound by it in the stare decisis sense.

73
VI. The Intent Required for a Section 1346 Violation

74
With respect to the intent necessary to make out a violation, we agree with the Rybicki panel's observation that, in accordance with our post-1988 case law, actual or intended economic or pecuniary harm to the victim need not be established. Rybicki, 287 F.3d at 261. "[T]he only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services." Id. at 262 (citing Sancho, 157 F.3d at 921).

75
VII. "Reasonably Foreseeable Harm" or "Materiality"?

76
The Rybicki panel also "h[e]ld that the elements necessary to establish the offense of honest services fraud pursuant to 18 U.S.C. § 1346 are: (1) a scheme or artifice to defraud; (2) for the purpose of depriving another of the intangible right of honest services; (3) where it is reasonably foreseeable that the scheme could cause some economic or pecuniary harm to the victim that is more than de minimis; and (4) use of the mails or wires in furtherance of the scheme." Rybicki, 287 F.3d at 266. We agree as to the first, second and fourth elements of the crime, but disagree as to the third.

77
Courts defining the elements of "honest services" fraud have chosen between two tests, "reasonably foreseeable harm" and "materiality." See United States v. Vinyard, 266 F.3d 320, 327-28 (4th Cir.2001), cert. denied, 536 U.S. 922, 122 S.Ct. 2587, 153 L.Ed.2d 777 (2002). The "reasonably foreseeable harm" standard has had, as the Rybicki panel noted, several incarnations. In the version that the Rybicki panel adopted, it must have been "reasonably foreseeable that the scheme could cause some economic or pecuniary harm to the victim that [was] more than de minimis." 287 F.3d at 266.

78
In Vinyard, the Fourth Circuit explained that under the competing "materiality" test, the trier of fact determines whether the misrepresentation "has the natural tendency to influence or is capable of influencing the employer to change his behavior." 266 F.3d at 328 (citation and internal quotation marks omitted). The Rybicki panel identified three Circuits that have taken an approach similar to the Fourth Circuit's. See Rybicki, 287 F.3d at 265 (citing United States v. Cochran, 109 F.3d 660, 667 (10th Cir.1997); United States v. Gray, 96 F.3d 769, 772, 776-77 (5th Cir.1996), cert. denied, 520 U.S. 1129, 117 S.Ct. 1275, 137 L.Ed.2d 351 (1997); United States v. Jain, 93 F.3d 436, 441-42 (8th Cir.1996), cert. denied, 520 U.S. 1273, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997)). We agree with these Circuits, and adopt the materiality test, holding that the misrepresentation or omission at issue for an "honest services" fraud conviction must be "material," such that the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct. See Gray, 96 F.3d at 774-75 (quoting Ballard, 680 F.2d at 353 (internal quotation marks omitted)). The question whether it is the business conduct of the defrauded victim that must always be at issue is not before us and we therefore do not decide it. See id.

79
We prefer the "materiality" test because it has the virtue of arising out of fundamental principles of the law of fraud: A material misrepresentation is an element of the crime. See, e.g., Bronston, 658 F.2d at 927.20 The "non-de minimis reasonably foreseeable harm" test, by contrast, seems to be something of an ipse dixit designed simply to limit the scope of section 1346. See, e.g., Vinyard, 266 F.3d at 328-29. As such, its foundation appears less secure.

80
In the case of private actors, at least, the "materiality" test captures those cases covered by the Rybicki panel opinion's version of the "reasonably foreseeable harm" test. Where it is "reasonably foreseeable that the scheme could cause some [non-de minimis] economic or pecuniary harm to the victim," Rybicki, 287 F.3d at 266, the misrepresentation is material because, in such cases, the victim's knowledge of the scheme would tend to cause the victim to change his or her behavior.

81
The reasonably foreseeable harm test of the Rybicki panel opinion, however, is limited to "economic or pecuniary harm." In this respect "materiality" may be a somewhat broader test: It may capture some cases of non-economic, yet serious, harm in the private sphere.

82
We expect the materiality requirement also to perform the function for which the panel opinion's "de minimis" requirement was designed. We doubt that the failure to disclose to an employer a de minimis "bribe" — the free telephone call, luncheon invitation, or modest Christmas present — is a material misrepresentation in the sense in which we and other Circuits use the term.

83
The district court instructed the jury not only, as the district court noted, id. at 266, as to reasonable foreseeability, but also that to convict, the jury was required to find that the scheme or artifice of the defendants employed to its ends material omissions in the information given to the insurance companies by their employees. We think that based on the evidence presented at trial with respect to such omissions, the jury could reasonably have concluded that they occurred and that they were material.

CONCLUSION

84
We conclude that the behavior of the defendants falls squarely within the meaning of a "scheme or artifice to deprive another of the intangible right of honest services," measuring it against the use of the term in the case law at the time section 1346 was adopted. The phrase "scheme or artifice [to defraud] by depriv[ing] another of the intangible right of honest services," in the private sector context, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person. The defendants in this case, using the mails and the wires with specific intent to defraud, caused the insurance-adjuster employees of the insurance companies to be bribed so that the insurance companies would pay claims in a manner that was not in the interests of the insurance companies but was, instead, secretly in the interests of the defendants. There were material omissions in the employees' communications with their employers that were necessary to the success of the scheme. The defendants' behavior therefore fell within the statutes' clear proscription.

85
There was sufficient evidence at trial to establish the four elements of the crime: (1) a scheme or artifice to defraud; (2) for the purpose of knowingly and intentionally depriving another of the intangible right of honest services as thus defined; (3) where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) use of the mails or wires in furtherance of the scheme.

86
The judgments of conviction and sentence of the district court are therefore affirmed.

Notes:

*
The Honorable Fred I. Parker participated in the in banc oral argument of this appeal but died before this opinion was filed

1
Inasmuch as the defendants were prosecuted under sections 1341 and 1343 in combination with section 1346, we have no occasion to consider whether they would also have been prosecutable under sections 1341 or 1343, standing alone

2
By contrast, where First Amendment rights are at stake:
The test we employ is familiar. Because conduct and not merely speech is involved, the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. We will not topple a statute merely because we can conceive of a few impermissible applications. The possibility of a substantial number of realistic applications in contravention of the First Amendment, however, suffices to overturn a statute on its face. In this regard, it bears emphasizing that the penalty to be imposed is relevant in determining whether demonstrable overbreadth is substantial. Although the fact that a criminal prohibition is involved does not obviate the need for the inquiry or a priori warrant a finding of substantial overbreadth, it does appreciably shrink the amount of overbreadth we will find constitutionally tolerable, particularly when the penalty is severe.
Massachusetts v. Oakes, 491 U.S. 576, 595-96, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989) (citations, internal quotation marks, and punctuation omitted).

3
In briefly outlining the history of facial challenges, we have noted that competing views in the Supreme Court have been set out in dicta and that, in our view, section 1346 withstands facial scrutiny under either. We therefore need not adopt, and do not mean to suggest our preference for, either

4
Sections 1341 was subsequently amended to apply to frauds carried out through private mail carriers. Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, Title XXV, § 250006, 108 Stat.2087 (1994). Sections 1341 and 1343 have also been amended to eliminate the $1,000 limit on fines,id. Title XXXIII, § 330016(1)(H), 108 Stat. 2147, and to increase the maximum sentence for violations not affecting a financial institution to twenty years' imprisonment, Sarbanes-Oxley Act of 2002, Pub.L. No. 107-204, Title IX, § 903, 116 Stat. 845 (2002).

5
The fourth category does not include private actors who scheme to defraud others of intangibleproperty, who remain subject to the mail-and wire-fraud statutes even after McNally held that deprivation of honest services was not covered by those statutes. See Carpenter v. United States, 484 U.S. 19, 27-28, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); cf. United States v. Kent, 608 F.2d 542, 546 (5th Cir.1979) (upholding fraud conviction of draftsman employed by an oil company paid by a competitor to purloin data regarding prospective well locations and bids on leases for land containing oil), cert. denied, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980).

6
Whether we are to examine 18 U.S.C. § 1346 on its face or as applied to the facts of the case before us to determine whether it is unconstitutionally vague is addressed in section V.E, below

7
The panel continued:
Several circuits, addressing this concern, have interpreted "scheme or artifice to deprive another of the intangible right of honest services" in such a way as to properly curtail the statute's reach. See, e.g., [United States v. Sun-Diamond Growers, 138 F.3d 961, 973 (D.C.Cir.1998)] (recognizing "the risk that federal criminal liability could metastasize" if § 1346 were read too broadly); Frost, 125 F.3d at 365-69 (noting breadth of literal terms of § 1346 and discussing various approaches to defining reach of statute); United States v. Cochran, 109 F.3d 660, 667 (10th Cir.1997) (observing that "it would give [the court] great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing"); United States v. Czubinski, 106 F.3d 1069, 1077 (1st Cir.1997) (noting that Congress did not enact § 1346 "to create what amounts to a draconian personnel regulation"); United States v. Jain, 93 F.3d 436, 441-42 (8th Cir.1996) (discussing problems with extending "honest services" doctrine to private sector); cf. United States v. Sawyer, 85 F.3d 713, 728 (1st Cir.1996) (holding, in context of misconduct by state government employees, that "[t]o allow every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced").
Rybicki, 287 F.3d at 264-65 (second and third alterations in original); see also Handakas, 286 F.3d at 109 ("Even the circuits that have reinstated pre-McNally law recognize that ad hoc parameters are needed to give the statute shape." (citations omitted)).

8
InNeder, the Court held that materiality is an element of "a scheme or artifice to defraud" under the federal mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and bank fraud, 18 U.S.C. § 1344, statutes, even though the statutes do not use the term. 527 U.S. at 20-21, 119 S.Ct. 1827. The Court concluded that at the times of enactment of these statutes, "fraud" had "a well-settled meaning at common law," id. at 22, 119 S.Ct. 1827, that included materiality, and the Court therefore "presume[d] that Congress intended to incorporate materiality," id. at 23, 119 S.Ct. 1827 (emphasis in original).

9
The strong presumptive validity that attaches to an Act of Congress has led [the] Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their languageE.g., Jordan v. De George, 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951), and United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation. E.g., United States v. Rumely, 345 U.S. 41, 47, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); see Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).
Parker, 417 U.S. at 757, 94 S.Ct. 2547 (1974) (quoting United States v. National Dairy Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963)); see also, e.g., Ashcroft v. Free Speech Coalition, 535 U.S. 234, 268, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (Rehnquist, C.J., dissenting) (arguing that a statute should be given a limiting construction, citing Parker, rather than struck down). Parker, upheld the constitutionality of certain provisions of the Uniform Code of Military Justice, after applying "the standard which applies to criminal statutes regulating economic affairs," Parker, 417 U.S. at 756, 94 S.Ct. 2547, a category undoubtedly including the mail- and wire-fraud statutes.

10
Although theMcNally Court spoke of its fear of "constru[ing] the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," 483 U.S. at 360, 107 S.Ct. 2875, the Court did not focus on federalism concerns. Perhaps it can be argued nonetheless, in light of the Supreme Court's later Commerce Clause cases, that if Congress wants to federalize such crimes it should do so in definite terms. Cf. United States v. Bass, 404 U.S. 336, 339, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (holding that Congress must speak clearly when it legislates in areas of criminal law that are traditionally regulated by the states); Cleveland v. United States, 531 U.S. 12, 27, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) ("Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States.").
Some joining this opinion are of the view that this argument, although linked to the alleged vagueness of the statute, may be more powerful than vagueness alone. That is, the statute, as they read it, does not present serious problems either with respect to letting individuals know that their behavior violates the law, or leaving too much uncontrolled discretion to police or prosecutors. See Kolender, 461 U.S. at 357, 103 S.Ct. 1855. The potentially more serious charge, they think, would be that Congress did not make clear enough how far it intended to enter into areas that have traditionally been governed by state law, and that this federalism concern, rather than vagueness, is the source of possible constitutional difficulties. We think, however, that when Congress enacted section 1346 in the light of the pre-McNally cases, it spoke with sufficient clarity to obviate the danger that federal courts, rather than Congress, would determine how deeply into traditionally state concerns the federal government ventured.

11
This is not a principle somehow peculiar to the Sherman Act, as the dissent suggests. For example,Neder itself, like the case at bar, was a mail- and wire-fraud case. And in Varity Corp. v. Howe, 516 U.S. 489, 502, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the Supreme Court took a similar approach to the interpretation of ERISA:
To decide whether [a party's] actions fall within the statutory definition of "fiduciary" acts, we must interpret the statutory terms which limit the scope of fiduciary activity to discretionary acts of plan "management" and "administration." ERISA § 3(21)(A). These words are not self-defining, and the activity at issue here neither falls clearly within nor outside of the common understanding of these words.... Though dictionaries sometimes help in such matters, we believe it more important here to look to the common law, which, over the years, has given to terms such as "fiduciary" and trust "administration" a legal meaning to which, we normally presume, Congress meant to refer. See, e.g., Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992).

12
We note a similar argument that has been made in a different contextSee John Paul Stevens, The Freedom of Speech, 102 Yale L.J. 1293, 1296 (1993) ("I emphasize the word `the' as used in the term `the freedom of speech' [in the First Amendment] because the definite article suggests that the draftsmen intended to immunize a previously defined category or subset of speech."); William Van Alstyne, A Graphic Review of the Free Speech Clause, 70 Cal. L.Rev. 107, 116 (1982) (discussing "the distinction between that speech within `the' freedom of speech [which receives special protection under the First Amendment] and that speech not within it."). While we find the parallel interesting, we of course have no occasion here to analyze, and do not endorse, the argument in the First Amendment context.

13
Our starting point in compiling a list of these cases is, as it was inHandakas, 286 F.3d at 101-02, the pre-McNally private sector "honest services" cases catalogued by Justice Stevens in his dissent in McNally, 483 U.S. at 363-64 nn. 3 & 4, 107 S.Ct. 2875. The cases we have reviewed, based on that list as modified and augmented by our own research, are United States v. Kwiat, 817 F.2d 440 (7th Cir.), cert. denied, 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987); United States v. Schwartz, 785 F.2d 673 (9th Cir.), cert. denied, 479 U.S. 890, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986); United States v. Price, 788 F.2d 234 (4th Cir.1986), vacated sub nom. McMahan v. United States, 483 U.S. 1015, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987); United States v. Conner, 752 F.2d 566 (11th Cir.), cert. denied, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985); United States v. Lemire, 720 F.2d 1327 (D.C.Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); United States v. Boffa, 688 F.2d 919 (3d Cir.1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983) & 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 501 (1983); United States v. Ballard, 663 F.2d 534 (5th Cir. Unit B 1981), modified in part and reh'g denied, 680 F.2d 352 (5th Cir. Unit B 1982) (per curiam); United States v. Bronston, 658 F.2d 920 (2d Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); United States v. Von Barta, 635 F.2d 999 (2d Cir.1980), cert. denied, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); United States v. Bohonus, 628 F.2d 1167 (9th Cir.), cert. denied, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); United States v. McCracken, 581 F.2d 719 (8th Cir.1978); United States v. Hasenstab, 575 F.2d 1035 (2d Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978); United States v. Bryza, 522 F.2d 414 (7th Cir.1975), cert. denied, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); United States v. George, 477 F.2d 508 (7th Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 155, 158, 49, 38 L.Ed.2d 61 (1973); and Epstein v. United States, 174 F.2d 754 (6th Cir.1949).
United States v. Louderman, 576 F.2d 1383 (9th Cir.), cert. denied, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978), and United States v. Condolon, 600 F.2d 7 (4th Cir.1979), are referred to in one of the footnotes following the discussion of "honest services" in Justice Stevens's McNally dissent, 483 U.S. at 363-64 n. 4, 107 S.Ct. 2875, but neither of them employs that term "honest services" or seems to involve an honest services fraud. Louderman involved the defendants' acquisition of confidential information from telephone companies and the post office for purposes of furthering their "skip tracing" business. The Ninth Circuit noted "a loss to the subscribers of their right to privacy, and telephone subscribers and post office box holders were being deprived of part of the service for which they were paying." Louderman, 576 F.2d at 1387. The defendants in Louderman are more properly characterized as depriving the victims of intangible rights, namely the right to privacy. Condolon — in which the Fourth Circuit upheld a wire-fraud conviction of a man who used the wires to procure sexual favors by pretending to be a talent agent — should similarly be characterized as a privacy case. Louderman and Condolon are thus not `honest services' cases because of the nature of the litigation, not because, as the dissent suggests, were they to fall within the scope of section 1346, the wire- and mail-fraud statutes would be rendered unconstitutionally vague.
United States v. Curry, 681 F.2d 406, 411 (5th Cir.1982) (PAC chairman convicted of depriving the members of their right to his "honest, true and faithful services as chairman" by taking for himself money that should have been given to candidates), is also listed in Justice Stevens' dissent, McNally, 483 U.S. at 363-64 n. 4, 107 S.Ct. 2875, but is essentially an embezzlement case.

14
Because federal law imposes special duties of loyalty on union officials, analysis of such cases may depart from analysis of other private sector cases

15
The Sixth Circuit found the dealing nonetheless to be "fair" and therefore reversed mail-fraud convictions remarking that "it must ... be concluded that the failure to make ... disclosure [of the secret ownership in the supplier] did not clothe this otherwise fair course of dealing with intentional fraud, dishonest in purpose, and inconsistent with moral uprightness."Id. at 768.

16
United States v. Bronston, 658 F.2d 920 (2d Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), was atypical. A partner in a New York law firm undertook, and was paid for, representing a personal client in its pursuit of a contractual relationship, while knowing that his firm was representing a competing client seeking the same contract. The defendant was convicted of mail fraud and we affirmed, reading the "theft of honest services" crime broadly, and finding a possibility of detriment in the firm's client's loss of "the precise interest which [the firm] had been retained to defend." Id. at 930. But the defendant neither personally represented the firm's client nor used confidential information acquired through the representation to his own client's advantage. The risk of detriment to the firm's client was that an adverse party was represented by the attorney it wanted. Although the firm's client did risk losing the contract it sought, this risk was not caused by a loss of honest services. Cf. Coffee, supra, 19 Am.Crim. L.Rev. at 130-34 (criticizing Bronston).

17
Although the bulk of the pre-McNally honest-services cases involved employees, we see no reason the principle they establish would not apply to other persons who assume a legal duty of loyalty comparable to that owed by an officer or employee to a private entity. See, e.g., United States v. Szur, 289 F.3d 200, 208-12 (2d Cir.2002) (affirming honest services mail- and wire-fraud convictions of principals of a brokerage and issuer of securities who conspired to pay stock brokers excess compensation, not disclosed to their customers, for selling the issuer's securities); United States v. Manas, 272 F.3d 159, 161-63 (2d Cir.2001) (reviewing sentences of defendants convicted of, inter alia, honest services fraud for a broker bribery scheme similar to that at issue in Szur), cert. denied, 537 U.S. 1023, 123 S.Ct. 533, 154 L.Ed.2d 434 (2002) & 537 U.S. 1176, 123 S.Ct. 1003, 154 L.Ed.2d 921 (2003); United States v. Ervasti, 201 F.3d 1029, 1032-36 (8th Cir.2000) (upholding honest services mail- and wire-fraud convictions of principals of a payroll processing company who failed to make payments to the IRS on behalf of customers, instead using the funds to pay their own expenses); United States v. Sancho, 157 F.3d 918 (2d Cir.1998) (upholding honest-services wire-fraud conviction of a defendant who offered a bribe to an FBI agent posing as a financial consultant retained to perform due diligence on the defendant in connection with the issuance of a letter of credit, in exchange for a falsely positive due diligence report) (per curiam), cert. denied, 525 U.S. 1162, 119 S.Ct. 1076, 143 L.Ed.2d 79 (1999); United States v. Cochran, 109 F.3d 660, 667-68 (10th Cir.1997) (analyzing, for honest-services fraud purposes, the duty owed by an investment banker hired to advise and assist a state in issuing bonds).

18
We do not consider the application of section 1346 to the contractual situations discussed by Judge Raggi in her concurrence

19
The dissent insists that the statement fromSancho that we address was not a dictum. If so, to that extent, Sancho is overruled.

20
We do understand that this creates something of an overlap: The phrase "scheme or artifice to defraud" requires "material misrepresentations."See United States v. Autuori, 212 F.3d 105, 115 (2d Cir.2000) ("As to the [scheme to defraud], the government was required to prove (i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." (citations omitted)); see also Neder, 527 U.S. at 25, 119 S.Ct. 1827 ("[W]e hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

KATZMANN, Circuit Judge, concurring:

87
I join the majority's opinion insofar as it affirms the judgments of conviction and sentences of the District Court by concluding that: (1) § 1346 is not unconstitutionally vague as applied to the defendants before us; (2) the evidence adduced at trial sufficiently supports their convictions; and (3) the trial judge properly instructed the jury on the elements of the crimes. I respectfully disagree, however, with the manner in which the majority addresses the constitutional question of whether § 1346 is vague on its face.

88
I recognize that this Court invited the parties to brief the constitutional issue of the facial vagueness of § 1346. But we should be ever mindful of the firmly entrenched tenet of constitutional adjudication that courts should "avoid[] the premature adjudication of constitutional questions." Clinton v. Jones, 520 U.S. 681, 690, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997). The Supreme Court has counseled that "`[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.'" Dep't of Commerce v. United States House of Representatives, 525 U.S. 316, 343, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (quoting Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)).

89
In the present case, we can easily avoid adjudicating the constitutional issue of § 1346's facial vagueness. The defendants did not present a facial challenge to § 1346 before either the District Court or the original panel. Therefore, as the majority observes, we apply the plain error standard of Federal Rule of Criminal Procedure 52(b). That standard requires that before we exercise our discretion to correct a forfeited error, there be (1) error that is (2) plain, that (3) affects substantial rights, and that (4) seriously affects the fairness, integrity or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). It cannot be said that any error with respect to facial vagueness is plain under current law, in a circumstance where "every circuit court to address the specific question of [facial] vagueness since the phrase `honest services' appeared in the statute has found § 1346 to be constitutional on its face." United States v. Handakas, 286 F.3d 92, 114 (2d Cir.2002) (Feinberg, J., concurring in part and dissenting in part). Moreover, the majority itself acknowledges that it is not clear whether it is proper for us to decide whether § 1346 is facially invalid because First Amendment concerns are not implicated. Maj. op. 144; see, e.g., United States v. Nadi, 996 F.2d 548, 550 (2d Cir.1993) ("[V]agueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity."). Accordingly, even if there were error, it was surely not plain. It was thus unnecessary for the majority to consider the standard to be applied in evaluating facial vagueness challenges.

90
I therefore do not join sections II.A and V.E of the majority opinion. I concur, however, with the remainder of the majority opinion.

91
RAGGI, Circuit Judge, concurring in the judgment:

92
I join the court in rejecting defendants' vagueness challenge to 18 U.S.C. § 1346 and in affirming the judgments of conviction. I write separately on the vagueness issue because I reach this conclusion via a somewhat different route from my colleagues in the majority. Specifically, while I agree that defendants' facial vagueness challenge to § 1346 fails whether reviewed as applied pursuant to Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), or more broadly pursuant to City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), I am of the view that Morales analysis is, in fact, unwarranted in this case. Further, unlike the majority, I rely on the language of the statute in rejecting defendant's vagueness challenge; thus, I agree with the majority's distillation of the pre-enactment "honest services" cases insofar as that analysis reinforces the constitutional application of the statutory text to this case. I do not, however, agree with the majority's decision to reaffirm United States v. Handakas, 286 F.3d 92 (2d Cir. 2002), or with its conclusion that in cases involving self-dealing frauds, the criminal scheme must be capable of causing economic or pecuniary detriment to fall within the constitutional limits of § 1346.

93
I. Defendants' Vagueness Challenge to 18 U.S.C. § 1346 Should Be Reviewed Only as Applied to the Facts of this Case

94
I agree with my colleagues in the majority that the term "the intangible right to honest services," as used in § 1346 to define a "scheme or artifice to defraud" prohibited by 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), is not unconstitutionally vague whether subjected to as-applied analysis, see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. at 495 & n. 7, 102 S.Ct. 1186 (1982) (and cases cited therein), or to some broader standard of facial review, see City of Chicago v. Morales, 527 U.S. at 62, 119 S.Ct. 1849 (Stevens, J., writing for the Court in part V). That being said, I conclude that only as-applied analysis is warranted in this case. Because the majority applies both Flipside and Morales, however, while the dissent insists on the "Morales test," district courts may conclude, in an abundance of caution, that they should engage in Morales review whenever presented with a claim of facial vagueness. This, I fear, would mark a radical and unwarranted departure from the tradition of as-applied review.

95
The long-standing preference for "as-applied" review of statutory vagueness challenges is "[e]mbedded in the traditional rules governing constitutional adjudication," notably, in "the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." Parker v. Levy, 417 U.S. 733, 759, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). This principle serves the jurisprudential maxim that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (opinion of Holmes, J.). Thus, if a federal statute can constitutionally be applied to a particular defendant's case, a court is obliged to construe the law to cover at least that circumstance. See generally Rust v. Sullivan, 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (noting courts'"categorical" duty to seek "every reasonable construction ... to save a statute from unconstitutionality" (internal quotation marks omitted)).

96
The Supreme Court has recognized "limited exceptions" to the principle of as-applied review, but "only because of the most `weighty countervailing policies,'" notably, when a challenged statute, on its face, threatens conduct protected by the First Amendment. Parker v. Levy, 417 U.S. at 759, 94 S.Ct. 2547 (quoting Broadrick v. Oklahoma, 413 U.S. at 611, 93 S.Ct. 2908 (noting exception made for challenges to statutes implicating First Amendment rights)); see Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Even in such circumstances, however, a court must presume the validity of the statute, see Parker v. Levy, 417 U.S. at 757, 94 S.Ct. 2547, and cannot construe it "`to violate the Constitution if any other possible construction remains available,'" Rust v. Sullivan, 500 U.S. at 190, 111 S.Ct. 1759 (quoting NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979)). As the Supreme Court has repeatedly cautioned, "[f]acial invalidation `is, manifestly, strong medicine' that `has been employed by the Court sparingly and only as a last resort.'" National Endowment for the Arts v. Finley, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (quoting Broadrick v. Oklahoma, 413 U.S. at 613, 93 S.Ct. 2908).

97
Thus, in Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362, the Supreme Court composed a variation on the theme of as-applied analysis for cases raising facial challenges to laws that "do[] not reach constitutionally protected conduct." In those circumstances, a facial challenge can succeed only if the complainant demonstrates "that the law is impermissibly vague in all of its applications." Id. at 497, 102 S.Ct. 1186; accord id. at 507-08, 102 S.Ct. 1186 (White, J., concurring in the judgment). In United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Court reiterated this principle in a criminal case: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." In practice, the Flipside/Salerno rule requires hypothetical analysis of "all applications" only in cases of pre-enforcement vagueness challenges. See, e.g., Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 684-86 (2d Cir.1996). Where, as in this case, defendants have already been prosecuted for specific conduct under the challenged law, Flipside itself instructs that a court confronting a facial vagueness challenge should "examine the complainant's conduct before analyzing other hypothetical applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. at 495, 102 S.Ct. 1186.

98
City of Chicago v. Morales represents no sharp break from established principles requiring statutes to be construed to uphold their constitutionality and favoring as-applied review of vagueness challenges. See 527 U.S. at 71, 119 S.Ct. 1849 (Breyer, J., concurring in part and concurring in the judgment). Our dissenting colleagues suggest that Morales identifies a broader two-prong test for vagueness review: does the law at issue (1) "fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," and (2) "authorize and even encourage arbitrary and discriminatory enforcement." id. at 56, 119 S.Ct. 1849 (plurality opinion by Stevens, J., joined by Souter and Ginsburg, JJ.); id. at 64-65, 119 S.Ct. 1849 (O'Connor, J., joined by Breyer, J., concurring in part and concurring in the judgment). In fact, this simply restates the twin due process concerns that have traditionally informed vagueness analyses. See Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); accord Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. at 498, 102 S.Ct. 1186. A court confronting a vagueness challenge must still decide whether to examine these concerns only in light of the particular case at hand or whether special circumstances warrant broader facial inquiry.

99
In Morales, three factors — none present in this case — prompted the Supreme Court to review a Chicago loitering ordinance for facial vagueness without regard to any specific application: (1) the law implicated constitutional rights, (2) it lacked a mens rea requirement, and (3) the state supreme court had declined to construe the law narrowly to avoid reaching innocent loitering.

100
In the view of three justices, the Chicago loitering ordinance implicated constitutional rights because "the freedom to loiter for innocent purposes is part of the `liberty' protected by the Due Process Clause of the Fourteenth Amendment." City of Chicago v. Morales, 527 U.S. at 53, 119 S.Ct. 1849 (plurality opinion by Stevens, J., joined by Souter and Ginsburg, JJ.). That fact, coupled with the ordinance's lack of an intent element, distinguished the case from Flipside: "This is not an ordinance that simply regulates business behavior and contains a scienter requirement. It is a criminal law that contains no mens rea requirement and infringes on constitutionally protected rights. When vagueness permeates the text of such a law, it is subject to facial attack." Id. at 55, 119 S.Ct. 1849 (internal citations and quotation marks omitted).

101
The federal mail and wire fraud statutes are plainly not "such a law."1 The conduct at issue — fraud — enjoys no constitutional protection, whether the deceitful scheme is aimed at a victim's property or at his intangible right to honest services. See Plumley v. Massachusetts, 155 U.S. 461, 479, 15 S.Ct. 154, 39 L.Ed. 223 (1894) ("The constitution of the United States does not secure to any one the privilege of defrauding the public."); see also Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 123 S.Ct. 1829, 1836, 155 L.Ed.2d 793 (2003) (noting that fraud is not conduct protected by the First Amendment). Further, mail and wire fraud do require proof of mens rea: a defendant must act or fail to act with "the specific intent to harm or defraud the victims of the scheme." United States v. Walker, 191 F.3d 326, 334 (2d Cir.1999); see United States v. DiNome, 86 F.3d 277, 283 (2d Cir.1996) ("fraudulent intent is `[e]ssential to a scheme to defraud'" (quoting United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir.1994)); United States v. Regan, 937 F.2d 823, 827 (2d Cir.1991) (mail and wire fraud are "specific intent crimes" requiring proof of defendant's "`conscious knowing intent to defraud'" (quoting United States v. Kyle, 257 F.2d 559, 564 (2d Cir.1958)).

102
My dissenting colleagues suggest that these distinctions are of no import because three other justices in Morales — Justices O'Connor, Kennedy, and Breyer — made no reference to constitutional rights or an intent requirement while concurring in holding the Chicago ordinance facially vague. See dissent at 157. The dissent concludes that "[t]he only proposition attracting a majority in Morales was that a criminal statute that `reach[es] a substantial amount of innocent conduct' and thereby fails to establish `minimal guidelines to govern law enforcement' is, on its face, unconstitutionally vague." (emphasis in original).

103
Identifying "majority" views among the four opinions of the six justices who ruled the Chicago ordinance facially invalid is sometimes a difficult task. I agree that the threat to innocent conduct — whether or not specifically protected by the Constitution — was a critical issue in Morales, but I understand this concern to have been inextricably linked to the law's failure to require proof of harmful intent. Indeed, the six justices in the Morales "majority" joined in concluding that the vagueness challenge in that case would have failed if the Chicago ordinance had been limited "to loitering that had an apparently harmful purpose." City of Chicago v. Morales, 527 U.S. at 62, 119 S.Ct. 1849 (Stevens, J., writing for the Court in part V); see also id. at 67, 119 S.Ct. 1849 (O'Connor, J., concurring in part and concurring in the judgment) (emphasizing that "the Court properly and expressly distinguishes the ordinance from laws that require loiterers to have a `harmful purpose'").2 Their conclusion accords with the established "doctrine that a scienter argument may save a statute which might otherwise have to be condemned for vagueness." United States v. Curcio, 712 F.2d 1532, 1543 (2d Cir.1983) (Friendly, J.); cf. Colautti v. Franklin, 439 U.S. 379, 395, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (and cases cited therein) (recognizing that "the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea").

104
In Morales, Justice O'Connor offered examples of how the loitering ordinance could be construed to include an intent requirement, thereby eliminating vagueness concerns. See City of Chicago v. Morales, 527 U.S. at 68, 119 S.Ct. 1849 (O'Connor, J., concurring in part and concurring in the judgment) ("The term `loiter' might possibly be construed in a more limited fashion to mean `to remain in any one place with no apparent purpose other than to establish control over identifiable areas, to intimidate others from entering those areas, or to conceal illegal activities.'"). The difficulty, as the six justices recognized, was that the Illinois Supreme Court had expressly declined to limit the statute in this way, see id. at 50-51, 119 S.Ct. 1849 (Stevens, J., writing for the Court in part II), and the United States Supreme Court was bound by that interpretation of state law, see id. at 61, 119 S.Ct. 1849 (Stevens, J., writing for the Court at part V); id. at 68, 119 S.Ct. 1849 (O'Connor, J., concurring in part and concurring in the judgment) (questioning state court interpretation of ordinance while recognizing its binding effect); see also id. at 69, 119 S.Ct. 1849 (Kennedy, J., concurring in part and concurring in the judgment); id. at 73, 119 S.Ct. 1849 (Breyer, J., concurring in part and concurring in the judgment). Because the Supreme Court was thus powerless to construe the ordinance more narrowly as applied to any case, a majority concluded that it was obliged to declare the law unconstitutionally vague in all applications. See id. at 61 & n. 31, 119 S.Ct. 1849 (Stevens, J., writing for the Court in part V); see also id. at 68, 119 S.Ct. 1849 (O'Connor, J., concurring in part and concurring in the judgment); id. at 71, 119 S.Ct. 1849 (Breyer, J., concurring in part and concurring in the judgment).

105
This case plainly differs from Morales in each of the three respects relevant to the Court's decision to conduct facial review without regard to specific application. First, as already noted, defendants can claim no constitutional protection for fraudulent conduct. Second, whatever debates there might be about the parameters of the "right to honest services" in a variety of imaginative scenarios, the federal fraud statutes, unlike the Chicago loitering ordinance, simply do not threaten "innocent conduct." No person can be guilty of fraud unless he specifically intends some harm to his victim. See United States v. Walker, 191 F.3d at 335; United States v. DiNome, 86 F.3d at 283; United States v. D'Amato, 39 F.3d at 1257. Finally, because defendants' vagueness challenge is to a federal statute, no state court ruling limits this court's ability, or its obligation, to construe the challenged law as necessary to ensure due process while preserving to the maximum extent possible the statute's effectiveness. See Rust v. Sullivan, 500 U.S. at 190, 111 S.Ct. 1759; United States v. Harriss, 347 U.S. 612, 623, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Under these circumstances, there is no reason to review § 1346 for vagueness except as applied to the facts of defendants' case.

106
II. The Language of 18 U.S.C. § 1346 Can Be Construed to Give Adequate Notice of the Conduct Proscribed

107
In evaluating defendants' vagueness challenge, my colleagues in both the majority and the dissent conclude, with almost no discussion, that the text of § 1346 offers little assistance. Majority at 135; Dissent at 158. I disagree.

108
The task of interpreting any statute must begin with its language. See Bailey v. United States, 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); United States v. Awadallah, 349 F.3d 42, 51 (2d Cir.2003). Although federal law does not specifically define the phrase "the intangible right to honest services," the words are not technical; their common meanings are well understood. See generally Mississippi v. Louisiana, 506 U.S. 73, 78, 113 S.Ct. 549, 121 L.Ed.2d 466 (1992) (relying upon plain meaning to define the word "exclusive"); Muscarello v. United States, 524 U.S. 125, 128-32, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (looking to ordinary English usage to discern meaning of "carry" as used in 18 U.S.C. § 924(c)(1)).

109
Black's Law Dictionary defines a "right" as "[a]legally enforceable claim that another will do or will not do a given act." Black's Law Dictionary at 1322 (7th ed.1999). The same source defines "service" as "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice." Id. at 1372. The word "honest" is commonly understood as "free from fraud or deception." Webster's Third New International Dictionary 1086 (1986); see also 7 Oxford English Dictionary 349 (2d ed.1989) (defining "honest" as "free from fraud"); Ballantine's Law Dictionary 566 (3d ed.1969) (defining "honest" as "descriptive of one who does not lie or cheat"). In sum, "the intangible right to honest services" can fairly be understood to mean a legally enforceable claim to have another person provide labor, skill, or advice without fraud or deception. I am confident that the public and the police can more readily apprehend this concept than a host of others that define criminal conduct, for example, the concept of vertical and horizontal relatedness that defines a "pattern" of racketeering. See Bingham v. Zolt, 66 F.3d 553, 566 (2d Cir.1995) (collecting cases rejecting vagueness challenges to "pattern" and "enterprise" elements of racketeering).

110
Indeed, implicit in the plain meaning of § 1346 are two limiting principles that serve notice on the public and guide the police as to the conduct proscribed. First, the law — whether federal or state, civil or criminal, tort or contract — must recognize an enforceable right to the services at issue. Second, Congress's decision to qualify the word "services" by the modifier "honest" indicates that not every breach of an employment contract or service agreement will support a federal fraud prosecution. What distinguishes "honest services" from the general provision of labor, skill, or advice is that the value of the particular services at issue largely depends on their being performed honestly, that is, without fraud or deception. An employer's right to the honest services of employees entrusted to disburse assets — as in the case of the insurance adjusters in the fraud scheme now before us — is an obvious example of conduct falling within the parameters of § 1346.

111
Further, when § 1346 is read together with § 1341 and § 1343, three additional elements define and limit the conduct proscribed: a defendant must specifically intend to harm or injure the victim of the fraud scheme; he must misrepresent or conceal a material fact, see Neder v. United States, 527 U.S. 1, 22, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); and the mails or wires must be used to further the scheme. Together, the five factors sufficed both to alert defendants that their scheme to corrupt insurance adjusters was prohibited by law and to ensure against arbitrary prosecution of the innocent. Where the plain meaning of a statute thus serves adequate notice of the conduct proscribed, the propriety of its broad sweep is a matter for policy debate. See Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 483-84, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992).3

112
III. The Majority's Decision to Reaffirm Handakas and Require Proof of Detriment in Self-Dealing Cases

113
The pre-enactment history of § 1346 detailed by the majority reinforces the plain meaning of the statutory text, but I am not convinced that it requires us to reaffirm United States v. Handakas, 286 F.3d 92, or to conclude, in this case, in which the statute is applied only to a kickback scheme, that "detriment" must be proved in other cases involving self-dealing frauds.

114
Section 1346 was enacted in response to McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), in which the Supreme Court overruled decades of decisions by circuit courts, including this one, holding that the mail and wire fraud statutes prohibited schemes to defraud individuals of their rights to honest services, see id. at 362-64 & nn. 1-4, 107 S.Ct. 2875 (Stevens, J., dissenting) (collecting cases).4 As the majority observes, Congress's use of the definite article to extend fraud protection to "the intangible right to honest services" indicates its intent to restore the right as it had been applied to a host of fraud schemes prior to McNally. See majority at 137-138; see also McNally v. United States, 483 U.S. at 376, 107 S.Ct. 2875 (Stevens, J., dissenting) (observing that McNally's decision to limit mail and wire fraud to property crimes stands virtually alone "against a tide of well-considered opinions issued by state or federal courts," which "correctly understood the intent of the Congress that enacted [the federal fraud] statute[s]").

115
Surveying the considerable body of pre-McNally case law, the majority identifies certain private sector relationships and circumstances where § 1346 clearly applies. Those cases include "a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the person to whom the duty is owed) secretly to act in his or her own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer." Majority at 126-127. I agree that these types of cases fit comfortably within the plain meaning of § 1346, but I do not understand the court to be limiting the statute's reach to the identified categories.

116
While a particular relationship may shed light on whether one person owes another honest services, the language of § 1346 indicates that the critical factor is the type of service at issue, not the relationship of the parties. See United States v. Sancho, 157 F.3d 918, 921 (2d Cir.1998) (per curiam) (holding that what matters is not a fiduciary relationship between the parties, but whether a duty comes within the statutory "right of honest services"). Today's case presents us with honest services fraud in the context of an employer-employee relationship. But a future case may require us to consider whether there is any principled reason to distinguish between an employee and an arms-length contractor when they engage in identical fraud schemes with the specific intent to deprive a victim of services whose value depends upon honest performance — for example, providing a due diligence report, a compliance certification, or an environmental assessment. To the extent United States v. Handakas, 286 F.3d at 102-13, may be interpreted to foreclose the prosecution of a contractor for fraudulently depriving a person of such honest services, I do not join the majority in re-affirming that decision. Rather, I agree with Judge Feinberg that § 1346 was not unconstitutionally vague as applied to the deceit in that case. Id. at 115-17 (Feinberg, J., dissenting in part and concurring in part).

117
Neither do I join the majority in pronouncing that "[i]n the self-dealing context," a § 1346 fraud "must ... cause, or at least be capable of causing, some detriment — perhaps some economic or pecuniary detriment — to the employer." Majority at 142. The case before us involves only a kickback scheme; the court should await a self-dealing case before deciding whether detriment is necessary to avoid statutory vagueness. United States v. Lemire, 720 F.2d 1327, 1337 (D.C.Cir.1983), cited by the majority to support a "detriment" requirement, in fact suggests that the crucial determination with respect to detriment is whether a defendant "might reasonably have contemplated" concrete harm to his employer from his failure to disclose self-dealing, a question more of intent than of capability. This distinction could well be significant in a self-dealing case involving an undercover victim. Lemire further explains that proof of possible detriment serves to ensure the materiality of a self-dealing defendant's misrepresentations or omissions. See id. Because materiality is necessarily fact specific, it would be premature to assume that the element can never be proved beyond a reasonable doubt except by evidence of detriment.

118
Retaining flexibility to recognize that other schemes, not precisely fitting within the models identified by the majority today, could constitute honest services fraud does not establish the vagueness of § 1346. Rather, it acknowledges the reality of fraud, a crime of extraordinary variety, limited only by human imagination. See, e.g., United States v. Altman, 48 F.3d 96, 102 (2d Cir.1995) (holding that fraud needs no definition: "it is as old as falsehood and as versable as human ingenuity" (internal quotation marks and citations omitted)).

119
Whatever other schemes may be prosecuted as honest services frauds in future cases, there is no question that the plain language of § 1346, read together with § 1341 and § 1343, is not unconstitutionally vague as applied to the defendants in this case. Accordingly, I concur in affirming the judgment of conviction.

120
JACOBS, Circuit Judge, joined by JOHN M. WALKER, JR., Chief Judge, JOSÉ A. CABRANES and B.D.

Notes:

1
Although defendants' vagueness challenge is specifically to § 1346, because that statute only defines conduct proscribed by § 1341 and § 1343, a court must consider all elements of mail and wire fraud in determining whether the public and the police are given fair notice of what constitutes the crime

2
Because the federal fraud statutes only reach deceitful schemes specifically intended to cause harm, they survive a facial vagueness challenge even under theMorales standard of review.

3
To the extent our dissenting colleagues also sound a federalism alarm to § 1346, warning that application of the statute to the public sector "invites federal prosecutors to police honesty in the corridors of state government,"dissent at 164, I am not persuaded that this threatens the Republic. Because § 1346 is not here applied to a public sector fraud, however, I leave further debate on this issue for another day.
Nevertheless, I do question whether the vagueness challenge before us has anything to do with federalism. If courts were to hold "the intangible right to honest services" too vague to satisfy due process in a federal statute, they would presumably be obliged to strike down the same language in state statutes. See, e.g., Ariz.Rev.Stat. § 13-2310(E) (2003) (defining "scheme or artifice to defraud" to include "a scheme or artifice to deprive a person of the intangible right of honest services"); 720 Ill. Comp. Stat. 5/17-24(e)(1)(2003) (defining "scheme or artifice to defraud" to include schemes "to deprive another of the intangible right to honest services"); 720 Ill. Comp. Stat. 5/16H-25(2)(2003) (same, but in the financial institution context); Md. Ann.Code § 8-509 (2002) (making it a crime knowingly and willfully "to defraud a State health plan of the right to honest services"); R.I. Gen. Laws § 19-9-29 (2003) (defining bank fraud to include "a scheme or artifice to deprive another of the intangible right to honest services"). In short, a vagueness ruling would mean no sovereignty, state or federal, could prosecute "honest services" frauds.
To the extent footnote 10 of the majority opinion somewhat cryptically alludes to a federalism argument that "may be more powerful than vagueness alone," I await the clear presentation of such an argument to a particular case before expressing any view as to its availability, let alone its merits.

4
Neither inMcNally nor in the "honest services" cases that preceded it does a court appear to have ruled that the concept is too vague to permit constitutional application.

PARKER, JR., Circuit Judges, dissenting:

121
I agree with the majority that the appellants likely forfeited their vagueness challenge, and that the issue is one of plain error. The test for plain error is that there must be (i) error, (ii) that is plain, (iii) that affects substantial rights, and (iv) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. This standard is satisfied here, applying the analysis we employed in United States v. Thomas, 274 F.3d 655, 667 (2d Cir.2001) (in banc). Certainly, conviction under a statute that is unconstitutionally vague on its face is an error of constitutional magnitude. See United States v. Handakas, 286 F.3d 92, 111-12 (2d Cir.), cert. denied, 537 U.S. 894, 123 S.Ct. 168, 154 L.Ed.2d 160 (2002). Reaching the merits, I respectfully dissent because in my view the so-called "honest services" amendment to the wire and mail fraud statute, 18 U.S.C. § 1346, flunks the test for facial vagueness set forth by the Supreme Court in City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

122
* The test for facial invalidity of a criminal statute was articulated by the Supreme Court in 1999: "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." Id. at 56, 119 S.Ct. 1849 (Stevens, J., writing for the Court, joined by Ginsburg and Souter, JJ.); accord id. at 64-65, 119 S.Ct. 1849 (O'Connor, J., concurring in part and concurring in the judgment, joined by Breyer, J.); see also Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

123
The majority opinion states that the governing standard for facial challenges outside of the First Amendment context is to be drawn from United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), which states in dicta that a statute is facially invalid only if there is "no set of circumstances" in which it would be valid. Id. at 745, 107 S.Ct. 2095. The majority's expressed preference for the 1987 Salerno dicta over the 1999 Morales holding is itself a bit of dicta because the majority holds that the statute in question survives scrutiny under either test. Maj. Op. at 144. Although I believe that section 1346 is so vague that there is "no set of circumstances" in which it is clear enough to be applicable, I think that the test does matter, chiefly to assure a sound analysis of constitutional sufficiency. I therefore undertake to demonstrate that the governing test is the one set forth in Morales.

124
At most, four Justices in Morales invoked the Salerno test for facial vagueness or words suggestive of that standard. See Morales, 527 U.S. at 77-81 & nn. 1-3, 119 S.Ct. 1849 (Scalia, J., dissenting); id. at 111-12, 114, 119 S.Ct. 1849 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia, J.); id. at 71, 119 S.Ct. 1849 (Breyer, J., concurring in part and concurring in the judgment) ("The ordinance is unconstitutional... because the policeman enjoys too much discretion in every case. And if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications."). In any event, Morales did not implement the Salerno dicta. See id. at 81, 119 S.Ct. 1849 (Scalia, J., dissenting) ("Instead of requiring respondents, who are challenging the ordinance, to show that it is invalid in all its applications, [the Justices in the majority] have required [the government] to show that it is valid in all its applications.").

125
It is true, of course, that several other propositions discussed in Morales only attracted a plurality. As the majority opinion notes, a three-Justice plurality of the Morales court would apparently allow challenges for facial vagueness outside of the First Amendment context to criminal laws that both lack a mens rea requirement and infringe on constitutional rights. See id. at 55, 119 S.Ct. 1849 (Stevens, J., writing for the Court, joined by Ginsburg and Souter, JJ.); Maj. Op. at 131. However, only those same three Justices believed that the ordinance challenged in Morales implicated such a constitutional right and lacked a specific intent requirement. Compare id. at 55, 119 S.Ct. 1849 (Stevens, J., writing for the Court, joined by Ginsburg and Souter, JJ.) ("[The challenged statute] is a criminal law that contains no mens rea requirement and infringes on constitutionally protected rights.") (internal citations omitted), with id. at 66, 119 S.Ct. 1849 (O'Connor, J., concurring in part and concurring in the judgment, joined by Breyer, J.) ("To be sure, there is no violation of the ordinance unless a person fails to obey promptly the order to disperse. But, a police officer cannot issue a dispersal order until he decides that a person is remaining in one place `with no apparent purpose' and the ordinance provides no guidance to the officer on how to make this antecedent decision.") and id. at 69, 119 S.Ct. 1849 (Kennedy, J., concurring in part and concurring in the judgment) (noting that the ordinance "reach[ed] a broad range of innocent conduct" and stating that "[t]he predicate of an order to disperse is not, in my view, sufficient to eliminate doubts regarding the adequacy of notice under this ordinance."). Thus, three of the six Justices supporting the result in Morales (Justices O'Connor, Kennedy, and Breyer) applied the Morales test outside the First Amendment context without regard to whether the statute had an intent requirement or infringed on a constitutional right. Certainly, none of these propositions nor the invocation of the Salerno standard — each attracting only a plurality in Morales — constitutes Supreme Court precedent.

126
The only proposition attracting a majority in Morales was that a criminal statute that "reach[es] a substantial amount of innocent conduct" and thereby fails to "establish minimal guidelines to govern law enforcement" is, on its face, unconstitutionally vague. Id. at 60-61, 119 S.Ct. 1849 (Stevens, J., writing for the Court in part V, joined by Ginsburg and Souter, JJ.), id. at 69, 119 S.Ct. 1849 (Kennedy, J., joining in part V, concurring in part and concurring in the judgment); see also id. at 64-65, 119 S.Ct. 1849 (O'Connor, J., concurring in part and concurring in the judgment, joined by Breyer, J.).

127
We are therefore required to apply Morales here. Although the majority holds that section 1346 withstands either test, it is quite clear that the statute imposes insufficient constraint on prosecutors, gives insufficient guidance to judges, and affords insufficient notice to defendants. That insufficiency can be illustrated by reference to the cases cited in the majority opinion. As to prosecutors, the majority does not disturb the holding that overturned the conviction in Handakas, 286 F.3d at 96, of a contractor who falsely promised to abide by New York's wage laws, on the ground that the "honest services" amendment was vague as applied. The majority opinion thus confirms that the prosecution in Handakas was misguided, or (in my view) that prosecutorial discretion was unguided altogether because the statute insufficiently describes the offense. The majority opinion similarly demonstrates that judges cannot understand what conduct this statute criminalizes. The majority holds that case law predating McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), is relevant to determining the meaning of section 1346 and thus rejects the contrary rule announced in United States v. Sancho, 157 F.3d 918, 922 (2d Cir.1998) (per curiam); the majority holds that reasonable foreseeability of non-de minimis economic or pecuniary harm is not a necessary element of the crime and thus rejects the panel's contrary holding in United States v. Rybicki, 287 F.3d 257, 265-66 (2d Cir.2002); and the majority rejects the view expressed in Handakas that the statute is facially vague (though that panel was constrained by Circuit precedent from so holding). 286 F.3d at 104-06. In short, if the statute means what the majority says it means, eight judges in this Circuit failed to understand it in Sancho, Handakas, and Rybicki. Of course, overturned convictions and in banc rejection of panel rulings do not prove facial vagueness. But this Circuit's long experience with section 1346 is nevertheless telling evidence that most lawyers and judges, not to speak of ordinary laymen or prospective defendants, cannot be expected to understand the statute.

II

128
The first question that bears on the vagueness inquiry is whether "a penal statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." Kolender, 461 U.S. at 357, 103 S.Ct. 1855. "The plain meaning of `honest services' in the text of § 1346 simply provides no clue to the public or the courts as to what conduct is prohibited under the statute." Handakas, 286 F.3d at 104. The majority opinion is a prolonged and sustained search for some prior settled meaning for an opaque statutory phrase — "the intangible right of honest services" — so that it can be construed as a term of art. That effort to infuse the putative term of art with meaning is conducted in a painstaking way, and considers an abundant variety of alternative meanings. However, a term of art has one single and apparent meaning, in the same way that a pun has two; it is as odd to conduct a scholarly search for the meaning of a term of art as it would be to hear a pun, conduct research in semantics, etymology and philology for a month, and then laugh.

129
It may be (as the majority holds) that, in enacting section 1346, Congress intended to reinstate a body of case law that had been overruled by the Supreme Court in McNally. See Handakas, 286 F.3d at 103, 104-05 (citing legislative history). But that insight gets us nowhere in terms of limits on prosecutorial power and notice to the public:

130
The requirement imposed by the Supreme Court [in McNally] to speak more clearly was not for the benefit of the Circuit Courts which had, in fact, given birth to these concepts in the first place. Rather, the requirement ... was for the benefit of the public, the average citizen, ... who must be forewarned and given notice that certain conduct may subject him to federal prosecution.

131
United States v. Brumley, 116 F.3d 728, 745-46 (5th Cir.1997) (in banc) (Jolly, J., dissenting) (emphasis added). A statute is unconstitutionally vague unless it provides a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." United States v. Strauss, 999 F.2d 692, 697 (2d Cir.1993) (internal quotation marks omitted). We have held that notice is insufficient if lay persons are required to "perform[] the lawyer-like task of statutory interpretation by reconciling the text of [] separate documents." Chatin v. Coombe, 186 F.3d 82, 89 (2d Cir.1999) (invalidating a prison administrative prohibition as unconstitutionally vague as applied). Construing a statute (as the majority does here) to say that scores of overruled cases are hereby revived, requires lay persons to do lawyer-like tasks that few lawyers would have the skills to perform:

132
[N]o one can know what is forbidden by § 1346 without undertaking the "lawyer-like task" of answering the following questions: [1] Can pre-McNally case law be consulted to illuminate the wording of § 1346? [2] Can any meaning be drawn from the case law, either the uneven pre-McNally cases or the few cases decided post- § 1346? [3] Is one to be guided only by case law within one's own circuit, or by the law of the circuits taken together (if that is possible)?

133
Handakas, 286 F.3d at 105.

134
It is remarkable how little the majority's search for meaning has turned up. The term of art for which meaning is sought is essentially the entire mouthful of the statute: "scheme or artifice to deprive another of the intangible right of honest services." Before McNally, this phrase encompassed four "categories" of honest-services cases:

135
[1] government officials who defraud the public of their own honest services; [2] elected officials and campaign workers who falsify votes and thereby defraud the electorate of the right to an honest election; [3] private actors who abuse fiduciary duties by, for example, taking bribes; and [4] private actors who defraud others of certain intangible rights, such as privacy.

136
Id. at 101-02 (citing McNally, 483 U.S. at 362-64 nn. 1-4, 107 S.Ct. 2875). Yet the majority's search for meaning bears upon no more than one subgroup of the four categories of honest-services cases.

137
Following an exhaustive, scholarly analysis, my colleagues conclude that one of these four categories of conduct criminalized by pre-McNally case law — the theft of privacy rights — cannot be revived as a criminal offense, presumably because the statute would be unconstitutionally vague under Salerno as well as Morales if so applied. Maj. Op. at 138-139 n. 13. Contra United States v. Condolon, 600 F.2d 7, 8-9 (4th Cir.1979); United States v. Louderman, 576 F.2d 1383, 1387-88 (9th Cir.1978). They also limit their search for meaning to cases of "honest services" fraud in the private sector. No attempt is made (advisedly) to describe the prohibition, if any, in the two remaining categories of public sector "honest services" fraud criminalized in the pre-McNally case law; any "well-settled meaning" relating to these remaining categories will presumably be supplied — or looked for — later.

138
The majority intuits a statutory meaning that is insufficient even to describe the subgroup of private sector cases. Where kickbacks or bribery are involved, the majority holds that a "scheme or artifice to deprive another of the intangible right of honest services" means:

139
a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.

140
Maj. Op. at 141-142. However, in cases of self-dealing, there "may" be an additional requirement that the alleged conduct "caused, or at least was capable of causing, some detriment" to the employer. Maj. Op. at 142 (emphasis added). The tentativeness of the majority's approach is well justified: a number of pre-McNally cases hold that there is no such requirement of economic detriment. See, e.g., United States v. Bronston, 658 F.2d 920, 927 (2d Cir.1981) (upholding mail fraud conviction against a law firm partner paid for representing a client in contract negotiation despite firm representing competing bidder); see also Rybicki, 287 F.3d at 262 ("[I]t was well-settled law both before and after McNally that the government does not have to establish that a scheme to defraud was successful or resulted in any actual [economic] harm to the victim."). The majority deems such cases "atypical," however. Maj. Op. at 141 n. 16. They may be atypical; but even assuming that a term of art can be distilled from the body of case law that was overruled in McNally, surely no unambiguous meaning can be assigned to a phrase that has no meaning except what can be distilled from some pre-McNally cases provided that other pre-McNally cases are ignored, particularly since the designation of overruled cases that are in and those that are out is itself essentially arbitrary. Ordinary people cannot be expected to undertake such an analysis; rare is the lawyer who could do it; and no two lawyers could be expected to agree independently on the elements of an offense that must be defined by such a project.

141
The majority claims that any ambiguity is of no concern here because defendants' conduct falls "squarely within the meaning of `scheme or artifice to deprive another of the intangible right of honest services' as distilled from the pre-McNally private sector cases." Maj. Op. at 142. But this argument is no answer to a facial challenge for vagueness. The only relevant question is whether "ordinary people can understand what conduct is prohibited." Kolender, 461 U.S. at 357, 103 S.Ct. 1855.

142
It is only too obvious that there is no settled meaning to the phrase "the intangible right of honest services" that is capable of providing constitutionally adequate notice. If there were, the judges and prosecutors in this Circuit would certainly know it. Yet, the majority overrules the holding (erroneously characterized as dicta) in Sancho, 157 F.3d at 922, that pre-McNally case law is irrelevant to determining the meaning of section 1346 — i.e., that "the intangible right of honest services" lacks a well settled meaning. The majority also concludes that the panel opinion in this case was wrongly decided insofar as it held that one element of a section 1346 offense is that a loss of money or property be reasonably foreseeable. See Rybicki, 287 F.3d at 265-66. Finally, the majority preserves the holding of Handakas, 286 F.3d at 96, which means that the prosecutors in the Eastern District of New York did not understand what the statute meant. How can the public be expected to know what the statute means when the judges and prosecutors themselves do not know, or must make it up as they go along?

III

143
The second question that bears on facial vagueness is whether the "legislature [has] establish[ed] minimal guidelines to govern law enforcement." Kolender, 461 U.S. at 358, 103 S.Ct. 1855. This second inquiry is "the more important" of the two, and is alone sufficient to decide constitutional infirmity. Id. at 358, 361 & n. 10, 103 S.Ct. 1855. The governing test is whether the statute "permit[s] `a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" Id. at 358, 103 S.Ct. 1855 (second alteration in original). "An enactment fails to provide sufficiently explicit standards for those who apply it when it impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis." Handakas, 286 F.3d at 107 (internal quotation marks and citations omitted). Thus, a statute is facially vague if it "necessarily entrusts lawmaking to the moment-to-moment judgment" of law enforcement. Morales, 527 U.S. at 60, 119 S.Ct. 1849 (Stevens, J., writing for the majority) (internal quotation marks omitted).

144
The majority opinion affirms the result in Handakas, which means (as I pointed out earlier) that the prosecutors in the Eastern District of New York did not understand what the statute meant. Moreover, the meaning supplied by the majority to uphold this use of section 1346 is as elusive as the statute itself. According to the majority, the "honest services" offense is a misrepresentation or omission that (i) is made by a private person who secretly acts in self-interest while purporting to act in the interests of the employer and (ii) is capable of leading a reasonable employer to change its conduct (i.e., it is "material"). Maj. Op. at 141-142. Neither requirement limits prosecutorial discretion.

145
No limit is placed on the exercise of prosecutorial discretion by requiring a showing that an employee secretly prefers her own interest to the interest of the employer; it is naive to assume that this preference is not the most common premise of private employment. "[R]elationships in the private sector generally rest upon concerns and expectations less ethereal and more economic than abstract satisfaction of receiving `honest services' for their own sake." United States v. Frost, 125 F.3d 346, 365 (6th Cir.1997). Every salaried employee can be said to work for her own interest while purporting to act in the interests of the employer. Yet the majority opinion effectively makes "dishonesty by an employee, standing alone, [] a crime." Id. at 368.

146
Nor is prosecutorial discretion limited by the "materiality" requirement See United States v. Sun-Diamond Growers, 138 F.3d 961, 973 (D.C.Cir.1998) ("Every material act of dishonesty by an employee deprives the employer of that worker's `honest services,' yet not every such act is converted into a federal crime by the mere use of the mails or interstate phone system."); Frost, 125 F.3d at 365 (in rejecting the materiality test: "[I]f a `change in business conduct' occurs under the materiality standard when a business alters its behavior merely to avoid the appearance of impropriety ..., the intangible right to honest services doctrine may lack substantive limits in the private sector.") (emphasis in original).

147
The majority codifies a doctrine that is as standardless as the statute itself. Nothing in the majority opinion prevents criminalization of any of the following conduct: a regulated company that employs a political spouse; an employee who violates an employee code of conduct; a lawyer who provides sky-box tickets to a client's general counsel; a trustee who makes a self-dealing investment that pays off; or an officeholder who has made a decision in order to please a constituent or contributor, or to promote re-election, rather than for the public good (as some prosecutor may see the public good).

148
The majority is unconcerned with the standardless sweep of the statute because supposedly there is "a wide swath of behavior" for which the prohibitions of section 1346 are "clear." Maj. Op. at 144. This statement turns upside down the Morales test for facial vagueness: whether a statute reaches a wide swath of behavior that no one (yet) deems criminal and fails to provide minimal guidance to law enforcement. See Morales, 527 U.S. at 60, 119 S.Ct. 1849 (Stevens, J., writing for the majority). "`It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" Kolender, 461 U.S. at 358 n. 7, 103 S.Ct. 1855 (quoting United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1875)). I share the confidence implicit in the majority opinion that prosecutors in this Circuit and the Attorney General under whom they serve can be trusted to avoid any systematic abuse of such a statute; but we should construe this statute so that it serves to bind those who nevertheless may need constraint.1

IV

149
The majority opinion's search for a meaning of art leans heavily on the overruled pre-McNally case law of other circuits. But "[e]ven the circuits that have reinstated pre-McNally law recognize that ad hoc parameters are needed to give the statute shape." Handakas, 286 F.3d at 109 (collecting cases). Although a number of circuits have upheld section 1346 against a claim of facial vagueness, there is now wide disagreement among the circuits as to the elements of the "honest services" offense. These opinions, taken together, refute rather than support the idea that section 1346 has any settled or ascertainable meaning or that the offense it describes has known contours:

150
• What mens rea must be proved by the government? The majority follows Second Circuit precedent in holding that an intent to cause economic harm is not required — a defendant need only have intended to deprive another of the "intangible right of honest services." Maj. Op. at 145. However, in the Seventh Circuit, an intent to achieve personal gain is an element of the offense. See United States v. Bloom, 149 F.3d 649, 656-57 (7th Cir.1998). But see United States v. Welch, 327 F.3d 1081, 1106-07 (10th Cir.2003) (holding that the text and structure of the mail fraud statutes do not support "adding an element" to "honest services" fraud requiring that defendant seek to obtain a personal benefit). The Eight Circuit describes the mens rea element as "caus[ing] or intend[ing] to cause actual harm or injury, and in most business contexts, that means financial or economic harm." See United States v. Pennington, 168 F.3d 1060, 1065 (8th Cir.1999). One circuit has held that, to secure an honest services conviction, "[t]he prosecution must prove that the employee intended to breach a fiduciary duty." Frost, 125 F.3d at 368. Other circuits merely require a showing of "fraudulent intent." See United States v. Cochran, 109 F.3d 660, 667 (10th Cir.1997); United States v. Jain, 93 F.3d 436, 442 (8th Cir.1996).

151
• Must the defendant have caused actual tangible harm? Compare Jain, 93 F.3d at 442 ("When there is no tangible harm to the victim of a private scheme, it is hard to discern what intangible `rights' have been violated."), with Frost, 125 F.3d at 369 ("[A] defendant accused of scheming to deprive another of honest services does not have to intend to inflict an economic harm upon the victim."). Some circuits have required that the misrepresentation be material, i.e., that the employee have reason to believe that the information would lead a reasonable employer to change its business conduct. See Cochran, 109 F.3d at 667 & n. 3; United States v. Gray, 96 F.3d 769, 775 (5th Cir.1996); Jain, 93 F.3d at 442. Other circuits only require a showing that it was reasonably foreseeable for the victim to suffer economic harm. Frost, 125 F.3d at 368; Sun-Diamond Growers, 138 F.3d at 973-74. We adopted this last requirement in the Rybicki panel opinion, and now abandon it. See Rybicki, 287 F.3d at 265.

152
• What is the duty that must be breached to violate section 1346? The majority holds that it is the duty owed by an employee to an employer, or by "a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers" (whatever that means). Maj Op. at 141-142. Some circuits only allow prosecutions for breach of an employee's duty to an employer. See, e.g., Brumley, 116 F.3d at 735. Other circuits require the breach of a fiduciary duty. See Frost, 125 F.3d at 366, 368; Sun-Diamond Growers, 138 F.3d at 974.

153
• Is the source of that duty state or federal law? The majority does not say, and other circuits are split. Compare Frost, 125 F.3d at 366 ("Federal law governs the existence of fiduciary duty under the mail fraud statute." (emphasis added)), with Brumley, 116 F.3d at 735 ("We have held that services under § 1346 are those an employee must provide the employer under state law." (emphasis added)).

154
• Did section 1346 revive pre-McNally case law; if so must each circuit look to its own governing precedent or to some set of rules distilled from the whole body of pre-McNally cases? See Brumley, 116 F.3d at 733-34 (looking to "plain language" of a statute to discern its "meaning" because "before McNally the doctrine of honest services was not a unified set of rules [a]nd Congress could not have intended to bless each and every pre-McNally lower court `honest services' opinion"); Frost, 125 F.3d at 364, 365 (holding that "§ 1346 has restored the mail fraud statute to its pre-McNally scope, according to previous opinions interpreting the intangible right to honest services" and looking to "Sixth Circuit precedent issued before McNally in order to discover the precise contours of the right in this circuit"). In Sancho, we held that pre-McNally cases could not be considered in determining the meaning of the statute. See 157 F.3d at 921-22. We now overrule Sancho and adopt an approach divining statutory meaning by analyzing cases overruled by McNally as a whole.

155
In sum, the circuits are fractured on the basic issues: (1) the requisite mens rea to commit the crime, (2) whether the defendant must cause actual tangible harm, (3) the duty that must be breached, (4) the source of that duty, and (5) which body of law informs us of the statute's meaning. This lack of coherence has created "a truly extraordinary statute, in which the substantive force of the statute varie[s] in each judicial circuit." Brumley, 116 F.3d at 743 n. 7 (Jolly, J., dissenting).

V

156
As the foregoing section documents, the vagueness of the statute has induced court after court to undertake a rescue operation by fashioning something that (if enacted) would withstand a vagueness challenge. The felt need to do that attests to the constitutional weakness of section 1346 as written. And the result of all these efforts — which has been to create different prohibitions and offenses in different circuits — confirms that the weakness is fatal. Judicial invention cannot save a statute from unconstitutional vagueness; courts should not try to fill out a statute that makes it an offense to "intentionally cause harm to another," or to "stray from the straight and narrow," or to fail to render "honest services."

157
"[L]egislatures and not courts should define criminal activity." United States v. Bass, 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); see also Handakas, 286 F.3d at 101 (punishment for "constructive offenses" violates the Due Process Clauses of the Fifth and Fourteenth Amendments, which "require the legislature to specify the elements of criminal offenses"); Bloom, 149 F.3d at 654 (describing "a federal common-law crime" as "a beastie that many decisions say cannot exist"). As the splintering among the circuits demonstrates, section 1346 effectively imposes upon courts a role they cannot perform. When courts undertake to engage in legislative drafting, the process takes decades and the work is performed by unelected officials without the requisite skills or expertise; and as the statutory meaning is invented and accreted, prosecutors are unconstrained and people go to jail for inchoate offenses.

158
The majority complacently cites by analogy similarly vague words in the Sherman Act that make unlawful any "restraint of trade." Maj. Op. at 137-138. The Sherman Act predates Morales by a century. Moreover, the comparison proves too much. Courts construe the Sherman Act primarily as a civil and regulatory statute, and criminal Sherman Act prosecutions have long been limited essentially to price-fixing. In keeping with its exceptional history, courts have broadly construed the Sherman Act as "a charter of freedom" akin to constitutional provisions. See, e.g., United States v. U.S. Gypsum Co., 438 U.S. 422, 439, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ("Simply put, the Act has not been interpreted as if it were primarily a criminal statute; it has been construed to have a `generality and adaptability comparable to that found to be desirable in constitutional provisions.'") (citation omitted)); 2 Phillip E. Areeda, Herbert Hovenkamp & Roger D. Blair, Antitrust Law § 303b4, at 33 (2d ed. 2000) ("Because they were usually dealing with civil proceedings, the courts have implicitly understood the Sherman Act as a mandate to develop a common law of antitrust — as indeed it would have to be in order to fulfill its purpose as a `charter of freedom.'"). The analogy to antitrust law is valid only insofar as section 1346 is an invitation by Congress for courts to develop a common law of criminal punishment.

159
Finally, "[t]he absence of discernible standards in the `honest services' doctrine implicates principles of federalism." Handakas, 286 F.3d at 110. The majority opinion in effect criminalizes all material acts of dishonesty by employees or by persons who owe analogous duties. While the majority opinion concerns itself only with private sector "honest services" fraud, there seems to be no principled basis in the statute's wording or in (overruled) cases for excluding from section 1346's reach services rendered in the public sector. Thus, without any obvious limiting principles, the majority opinion invites federal prosecutors to police honesty in the corridors of state government by invoking section 1346 against state employees for their acts of "honest services" fraud. This construction of section 1346 undoubtedly "leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials." McNally, 483 U.S. at 360, 107 S.Ct. 2875.

160
I believe that Congress has not heeded the Supreme Court's admonition to "speak more clearly than it has." See id. We should not "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." Cleveland v. United States, 531 U.S. 12, 24, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000).

161
The majority opinion exhibits deference to Congress by conscientiously seeking to understand congressional intent, and the effort and product are scholarly and scrupulous. But the work accomplished by the majority opinion, which is admirable in its way, is properly the work of legislators in statutory drafting and the work of the executive in framing prosecutorial standards. "If the words of a criminal statute insufficiently define the offense, it is no part of deference to Congress for us to intuit or invent the crime." Handakas, 286 F.3d at 109-10. I respectfully dissent.

Notes:

1
The majority ultimately relies on the reductionist argument that these defendants must have known that it would be illegal "to use the wires and the mails ... to pay off insurance adjustors." Maj. Op. at 142. The natural drift of this observation is that the scheme inflated the settlement of claims to the benefit of the defendants' clients and to the detriment of the insurance companies. However, the government never contended that this occurred. As the majority opinion recites, "the government acknowledged that it would not seek to prove that the amount of any of the settlements connected with a payment to an adjuster had been inflated above what would have been a reasonable range for that settlement." Maj. Op. at 128. There was certainly no reason for these defendants to believe that the gratuities at issue — which the government never contended caused a loss — amounted to a federal mail or wire fraud violation

162
JOHN M. WALKER, JR., Chief Judge, and JOSÉ A. CABRANES, Circuit Judge, dissenting.

163
We agree in full with Judge Jacobs' dissenting opinion. We write separately to emphasize and explain that it is the opportunity of en banc review that frees us from the Circuit precedents that compelled us in previous cases to apply the statute that we now would hold unconstitutional on its face. See United States v. Rybicki, 287 F.3d 257 (2d Cir.2002); United States v. Handakas, 286 F.3d 92 (2d Cir.2002). Indeed, in the Handakas opinion, which one of us joined, the panel noted that it was Circuit precedent that compelled application of the "honest services" amendment to the wire and mail fraud statute, 18 U.S.C. § 1346, and stated that "[i]f we were the first panel attempting to discern the meaning of the phrase `honest services' in § 1346, we would likely find that part of the statute so vague as to be unconstitutional on its face." 286 F.3d at 104. And in the Rybicki opinion, which one of us authored and the other joined, we "agree[d] fully" with that observation of the Handakas panel, while noting that we were "bound by this court's precedents upholding convictions under § 1346 that involved schemes[] like the one at issue here." 287 F.3d at 263-64. It is well settled that a panel of this court is "`bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court en banc.'" BankBoston, N.A. v. Sokolowski, 205 F.3d 532, 534-35 (2d Cir.2000) (per curiam) (quoting United States v. Allah, 130 F.3d 33, 38 (2d Cir.1997)); see also United States v. Santiago, 268 F.3d 151, 154 (2d Cir.2001).

164
Now, on en banc review, we have the freedom to revisit the larger question of the facial vagueness of § 1346, and we are no more compelled to follow the Circuit precedents dictating our holdings in Rybicki and Handakas than we are compelled to follow the holdings of those two opinions themselves. Accordingly, we respectfully dissent for the reasons cogently stated by Judge Jacobs.